**IN THE UNITED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JEROD HOBBS, RONALD LEE,** | § | |
| **JORDON ARROYO and ARLEN** | § | |
| **JONES, Individually and on behalf** | § | |
| **of others similarly situated,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:16-CV-00770** |
| | § | |
| **EVO INCORPORATED,** | § | |
| **MAURICE McBRIDE,** | § | |
| **SAM COPEMAN and FRANCIS** | § | |
| **NEILL,** | § | |
| | § | |
| **Defendants.** | § | |

---

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

TO THE HONORABLE COURT:

Plaintiffs Jerod Hobbs, Ronald Lee, Jordon Arroyo and Arlen Jones submit these Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

**Proposed Findings of Fact**

1. Defendant EVO Incorporated provides downhole video camera services for the oil and gas industry. JPO 6.1, Admission of Fact.

2. Defendant EVO Incorporated was and is part of an enterprise in commerce within the meaning of 29 U.S.C. § 203(s)(1), in that this defendant had, and/or continues to have employees, engaged in commerce or the production of goods for commerce. Further, Defendant EVO Incorporated has and had an annual gross volume of sales made or business done of not less than $500,000.00 (exclusive of excise taxes at the retail level). JPO, 6.2, Admission of Fact.

3. Defendant EVO Incorporated was and is a part of an enterprise within the meaning of section 3(r) of the FLSA, 29 U.S.C. § 203(r). JPO 6.3, Admission of Fact.

4.   Defendant EVO Incorporated is a domestic for-profit corporation organized under the laws of the State of Texas with its principal place of business in Houston, Harris County, Texas.  This Court has personal jurisdiction over Defendant EVO Incorporated. JPO 6.4, Admission of Fact.

5.   Defendant EVO Incorporated has its main offices and operates in Harris County, Texas. Defendant EVO Incorporated formulates and communicates decisions regarding work schedules and rate and method of compensation from this office. JPO 6.5, Admission of Fact.

6.   Defendant Maurice McBride is a citizen of Britain, United Kingdom.  McBride agrees that his Court has specific personal jurisdiction over him for the purposes of this case. JPO 6.6, Admission of Fact.

7.   Defendant Sam Copeman is a citizen of Britain, United Kingdom.   Copeman agrees that this Court has specific personal jurisdiction over him for the purposes of this case. JPO 6.7, Admission of Fact.

8.   Defendant Francis Neill is a citizen of the United Kingdom.  Neill agrees that this Court has specific personal jurisdiction over him for the purposes of this case. JPO 6.8, Admission of Fact.

9.   Defendant EVO Incorporated is an employer under the FLSA. JPO 6.9, Admission of Fact.

10.   Defendant Francis Neill is an employer under the FLSA. JPO 6.10, Admission of Fact.

11.   Defendant McBride acted as interim CEO of EVO Incorporated from June or July 2015 until April 2016. JPO 6.11, Admission of Fact

12.   Defendant Copeman served as Director of EVO Incorporated, Corporate Officer     of EVO Incorporated, and acted as President of EVO Incorporated. JPO 6.12, Admission of Fact.

13.   Plaintiffs Jerod Hobbs, Ronald Lee, Arlen Jones and Jordan Arroyo were Defendant EVO Incorporated's employees with the meaning of the FLSA, 29 U.S.C. § 203(e). JPO 6.13, Admission of Fact.

14.   Plaintiff Jerod Hobbs was employed by Defendant EVO Incorporated from September 1, 2011 until August 6, 2018. JPO 6.14, Admission of Fact.

15.   Plaintiff Ronald Lee was employed by Defendant EVO Incorporated from September 2, 2014 until May 4, 2018. JPO 6.15, Admission of Fact.

16.   Plaintiff Jordon Arroyo was employed by Defendant EVO Incorporated from January 1, 2013 to January 26, 2016. JPO 6.16, Admission of Fact.

17.   Plaintiff Arlen Jones was employed by Defendant EVO Incorporated April 2011 through October 5, 2014. JPO 6.17, Admission of Fact.

18.   Plaintiffs worked as field engineers for EVO Incorporated. JPO 6.18, Admission of Fact.

19.   Plaintiffs earned at least $455.00 per week, JPO 6.19, Admission of Fact.

20.   Plaintiffs, as field engineers, would travel to customers' well site locations. JPO 6.20, Admission of Fact.

21.   Plaintiffs, as field engineers, would not make completion decisions for customers. JPO 6.21, Admission of Fact.

22.   After a job was complete, the field engineers would give EVO's customers a thumb drive that contained downhole video, the job log and individual pictures requested by the customer that the field engineers collected   during the job. JPO 6.22, Admission of Fact.

23.   Plaintiffs, as field engineers, did not and could not set or adjust the rate of pay of employees.  JPO 6.23, Admission of Fact.

24.   Plaintiffs, as field engineers, did not handle employee grievances or complaints. JPO 6.24, Admission of Fact.

25.   Plaintiffs, as field engineers, did not discipline other employees. JPO 6.25, Admission of Fact.

26.   Plaintiff Hobbs initial title was West Virginia Base Manager. JPO 6.26, Admission of Fact.

27.   Plaintiff Hobbs was initially based in West Virginia, but then transferred to Oklahoma as a field engineer. JPO 6.27, Admission of Fact.

28.   Plaintiff Jones was based in Oklahoma. JPO 6.28, Admission of Fact.

29.   Plaintiff Arroyo was based in California. JPO 6.29, Admission of Fact.

30.   Plaintiff Lee was based in Colorado. JPO 6.30, Admission of Fact.

31.   Plaintiffs, as field engineers, were typically the sole EVO representative at a customer's site. JPO 6.30, Admission of Fact.

32.   Plaintiffs, as field engineers, interfaced with wireline operators, engineers and company representatives while on the job site. JPO 6.32, Admission of Fact.

33.   Plaintiffs, as field engineers, typically prepared job logs and summaries on location where they obtained images and annotated their observations in real time for the customers' use. JPO 6.33, Admission of Fact.

34. Plaintiffs initiated this lawsuit on March 24, 2016 as a collective action. JPO 6.34, Admission of Fact.

35. Plaintiffs sent notices of the collective action to potential class members on October 20, 2017. No other individuals joined this lawsuit. JPO 6.35, Admission of Fact.

36. The recovery period for Plaintiff Hobbs is March 24, 2014 to August 6, 2018. JPO 6.36, Admission of Fact.

37. Hobbs total compensation was $163,392.01 in 2014, $164,750.00 in 2015, $110,576.50 in 2016, $125,140.33 in 2017, and $85,393.19 in 2018. JPO 6.37, Admission of Fact.

38. The recovery period for Lee is September 2, 2014—May 4, 2018. JPO 6.38, Admission of Fact.

39. Lee's total compensation was $24,783.25 in 2014, $100,839.46 in 2015, $72,541.51 in 2016, $75,150.80 in 2017, and $29,972.33 in 2018. JPO 6.39, Admission of Fact.

40. Arroyo's recovery period is March 24, 2014—January 26, 2016. JPO 6.40, Admission of Fact.

41. Arroyo's total compensation was $58,752.00 in 2014, $60,530.88 in 2015, and $9,875.00 in 2016. JPO 6.41, Admission of Fact.

42. The recovery period for Jones is March 24, 2014—October 5, 2014. JPO 6.42, Admission of Fact.

43. Jones earned $122,932.07 in 2014. JPO 6.43, Admission of Fact.

44. Defendant EVO Incorporated treated Plaintiffs as exempt employees for overtime purposes. JPO 6.43, Admission of Fact.

45. Plaintiffs did not primarily performed work directly related to the management or general business operations of the employer or the employer's customers.

46. Plaintiffs did not exercise discretion and independent judgment with respect to matters of significance as field engineers for Defendant EVO.

47. Plaintiffs primary duty was producing the services that Defendant EVO Incorporated exists to produce and market as opposed to administering the business affairs of the company or its customers.

48. Plaintiffs did not perform work directly related to assisting with the running or servicing of the business as distinguished from "work involving repetitive operations with hands, physical skill and energy such as that done by "non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, [and] mechanics.

49.    Plaintiffs work as field engineers did not directly related to the management or general business operations in functional areas such as tax, finance, accounting, budgeting, auditing, insurance, quality control, purchasing procurement, advertising, marketing, research, safety and health, personnel management, human resources, employee benefits, labor relations, public relations, government relations, computer network, internet and database administration, legal and regulatory compliance or similar activities.

50.    Plaintiff's primary job duties were not making sales or obtaining orders or contracts and they were not customarily and regularly away from EVO's place of business in performing these types of duties.

51.    Defendant EVO responded to interrogatory request as to the job duties of Plaintiff's in its Responses to Plaintiffs' First Set of interrogatories (Plaintiffs' Exhibit 1) and in their Supplemental Responses to Plaintiffs' First Set of Interrogatories (Plaintiffs' Exhibit 2) in both of these responses, Defendants identified a number of duties. None of these duties included duties directly related to the management or general business operations in functional areas such as tax, finance, accounting, budgeting, auditing, insurance, quality control, purchasing procurement, advertising, marketing, research, safety and health, personnel management, human resources, employee benefits, labor relations, public relations, government relations, computer network, internet and database administration, legal and regulatory compliance or similar activities, or exercise of independent judgment and discretion in matters of significance to the Company or the customer or sales responsibilities. None of the duties identified by Defendant EVO would qualify as an exemption under the FLSA. Def. Resp., Int. no. 4, p.2; Def. Supp. Resp., Int. 4, pp. 5,6.

52.    The job duties of a field engineer as described in the Job Description (Plaintiffs' Exhibit 4) do not included duties directly related to the management or general business operations in functional areas such as tax, finance, accounting, budgeting, auditing, insurance, quality control, purchasing procurement, advertising, marketing, research, safety and health, personnel management, human resources, employee benefits, labor relations, public relations, government relations, computer network, internet and database administration, legal and regulatory compliance or similar activities, or exercise of independent judgment and discretion in matters of significance to the Company or the customer or sales responsibilities.

53.    Defendant EVO provided a job description for the position of "Trainee Field Engineer" for Jordan Arroyo. (Exhibit G) the overall purpose of the job is described as "to operate EV Downhole video equipment, on location, in a professional, competent and safe manner in order to satisfy the client requirements." This document listed fifteen principal accountabilities. None of those accountabilities included exercise of independent judgment or discretion affecting EVO's or a customer's principal business. Sales responsibilities were also not included as a principal accountability under decision-making authority the job description notes that the workscope is allocated by

Operations Manager. It also notes that "On job discussions based on experience and in
accordance with company procedures and policies."
Job context and main activities are described as "operating EV Down hole tools on
location in a professional competent and safe manner in order to satisfy the client
requirements." Plaintiffs' Exhibit 14.

54.     In response to Defendant EVO's First Set of Interrogatories number 10, Plaintiff Jerod
        Hobbs described his job functions as follows: "The job functions I was expected to
        perform were to find customers, travel to job locations, run a camera in their hole to
        identify what was wrong, and follow up with them afterwards to make sure everything
        was ok. I had some involvement in sales. I was also expected to maintain my tools
        through preventative maintenance measures. I was given the title of Manager when I
        first joined EVO Incorporated, but I was never responsible for any management duties.
        I never had access to other individuals' records, timesheets, or rates of pay. I was never
        required to attend Management meetings in the UK. I was never invited to the weekly
        management phone calls on Monday morning.  Pl. Hobbs, Resp. Int. no. 10
        Defendants' Exhibit 42.

55.      In response to Defendant EVO's First Set of Interrogatories no. 10, Plaintiff Jordan
        Arroyo described his job functions as follows "my main job function for EVO was
        travel to job location, rigging up and operating cameras to get pictures inside the
        wellbore. I communicated with oil and gas operators as to how to clean up their
        wellbore to get quality images and completed detailed both job reports. I would make in
        person sales calls to potential client. I kept inventory of tools in the warehouse."
        Defendants' Exhibit 17.

56.     In response to Defendant EVO's First Set of Interrogatories number 10, Plaintiff Arlen
        Jones described his job functions as follows: "my primary job function was to go out
        into the field for our customers, rigging up and operating downhole video equipment
        and traveling to and from job locations. It also included coordinating with other service
        companies on location. I also was required to train new hires. I had some involvement
        in field sales."  Pl. Jones, Resp. Int. no. 10 Defendants' Exhibit 57.

57.     In response to Defendant EVO's First Set of Interrogatories number 10, Plaintiff Ron
        Lee described his job functions as follows: "When I was interviewed by Arthur White
        and subsequently hired at EVO, I was told that my job schedule was to report daily
        (Mon-Fri at a minimum, and as necessary on weekends) at the shop from 8am to 5pm.
        My designated shop duties where were to help out as able, needed and/or directed in the
        shop.  Specifically, to perform equipment checkouts, diagnostics, upgrades,
        modifications and repairs along with shipping/receiving assets, and a host of other
        related shop tasks.  After a few months, I requested approval from Arthur to adjust my
        shift times to 30 min later (8:30 am to 5:30 pm) to avoid peak rush hour traffic delays,
        to which he agreed.
         In addition to these shop duties, I was to perform field duties as a downhole well-bore
        camera operator (aka: Field Engineer) whenever a job called in from a client and was
        assigned to me.  My field duties include communication/working as a team with other

support agencies under the overall direction and control of our clients/clients designated representative, to perform video logging of downhole completion systems per their desired objective. General duties include equipment rig-up, operation of camera controls, communicating desired actions or ideas to achieve objectives and proceeding as advised or directed by designated subject matter experts such as Field supervisors and 3rd party support agency operators or supervisors. Post job actions include rigging down tools, providing video log to customer and general impression of findings pending any further review or inquiry among EV SMEs, post job documentation, field level care/maintenance of equipment, standby for clients/supervisor as directed and over the road traveling. These assigned field jobs, hours and duties often occur in conjunction with or after completion of a full in-shop work shift and/or work week." Pl. Lee, Resp. Int. no. 10 (Defendants' Exhibit 82).

58. Jordon Arroyo was a field tech for EVO. Arroyo Dep. at 45:21 – 25. He was told that he would work for Greg Linville, a consultant for EVO Arroyo Dep. at 46:22 – 47:6 Jordan Arroyo was told that he would be helping Greg Linville with the jobs and basically putting tools together. He was there to help Greg Linville with whatever he needed. He was told that he would do most of the manual labor work there. He explained manual labor meant putting tools together, wrenching little things and helping the rig crews out in the field. The tools included a camera tool. He would put tool together. He would help rig crews on job sites. He would communicate with truck drivers, work on the well head with pipe wrenching, and help wire line crews taking part in putting together equipment at the pump. Approximately 70% of the time he would work with Greg Linville. He would rig up the camera, clean the tools, be the communicator between the rig people, the water trucks, the wireline crews and Greg Linville. He would disable tools and he would put the tools back. He would inventory tools, he would clean the camera tools and pipe wrenches and any other tools that had to do with the camera. He would clean whatever tools got oil on them. Arroyo Dep. at 47:18 – 54:20. Plaintiffs' Exhibit 8.

59. Jordon Arroyo testified that he was pretty much training for three years. He testified that Greg Linville liked to run the jobs. Arroyo 56:12 – 25; 57:17 – 22. He testified that during the last four or five months of his work for EVO, he would run the job if there were 2 jobs or Greg Linville was sick. Arroyo Dep. at 58:1 – 59:1359:18 – 60:23. He performed roughly 10 jobs during those last four or five months on his own. Arroyo Dep. at 64:5 – 7. Plaintiffs' Exhibit 8.

60. Jordon Arroyo testified that he also worked in the warehouse and shop. Arroyo Dep. at 65:8 – 22. When working in the shop, Jordon Arroyo would clean tools, test tools and make sure that tools ran. He was also involved in rebuilding a wireline truck for about a year. Arroyo Dep. at 128:20 – 129:2. Plaintiffs' Exhibit 8.

61. Arroyo testified that client would tell him where they wanted the camera to go, maybe the footage or distance, where they would like him to run the camera and things they would want him to focus on or spend more time on. He testified that most of the time he was given directions where they wanted him to look, but he was able to look at things on

his own as well. Arroyo testified that he would only interpret information that he saw on the camera if he was asked. Arroyo Dep. at 81:20 – 85:8. Plaintiffs' Exhibit 8.

62. Jordon Arroyo testified that he had never gotten the title of being an expert for EVO on job sites. Arroyo Dep. 87:21 – 88:2. Plaintiffs' Exhibit 8.

63. Jordan Arroyo testified that there was an occasion or to when he provided his opinion on the well site, but that it was very rare. He testified that he was usually just out there getting ordered around. He testified that most of the work was preplanned. Arroyo Dep. at 90:15 – 91:6. Plaintiffs' Exhibit 8.

64. Jordan Arroyo testified that he made very minimal decisions on his own, including annotation notes on the pictures, when he was ready to start rigging up, running the tool down, cleaning his own tools, taking care of his own tools and setting the camera up. Arroyo Dep. at 91:18 – 92:19. Plaintiffs' Exhibit 8.

65. Jordon Arroyo testified that he would take pamphlets and Greg Linville's cards to customers when times were slow. He testified that this would happen 10 to 15% of the time. He might do this five times during the month. He testified that some months he would not do this at all if they were busy. Arroyo Dep. at 93: 9 – 95:21 96:5 – 97:3. Plaintiffs' Exhibit 8.

66. Jordon Arroyo testified that safety meetings were held before jobs. He testified that in those meetings everyone involved with the job goes over their safety hazards. He testified that ordinarily Greg Linville would do this unless he was by himself. Arroyo Dep. at 97:4 – 98:6. Plaintiffs' Exhibit 8.

67. Jordon Arroyo testified that on occasion he would be involved in meetings with the client for preparation for a job. He was not there to assist the client in coming up with conclusions about how to safely perform the job Arroyo Dep. at 111:16 – 112:24; 114:1 – 12. Plaintiffs' Exhibit 8.

68. Jordon Arroyo testified that it was his understanding that EVO ran downhole camera tools and other type of logging tools. He would not work with the other type of logging tools. He testified that EVO runs down hole tools or cameras for casing inspections. Arroyo Dep. at 131:16 – 132:10. Plaintiffs' Exhibit 8.

69. Jordan Arroyo described the work process when he was on a job location by himself. It included having the safety meeting with people from other crews, setting up his equipment with the wireline crew and also the rig crew. He described the process in flushing the casing with fluid, hooking up the camera to the wireline truck and deciding when to start running the camera down hole. He testified that from that point forward, he followed instructions that were given to him by the Company engineer or Greg Linville. He testified that Greg Linville would give him instructions remotely if he was not on location. He would call Greg Linville for questions on the job. On occasion he could

trouble shoot a problem and fix it by himself Arroyo Dep at 180:22 – 183:16. Plaintiffs' Exhibit 8.

70. Jordan Arroyo would advise or consult with the rig crew on how to prepare the well with Greg Linville's instructions. He testified there were only a couple of jobs toward the end of his work where he did not need those instructions Arroyo Dep. 194:23 – 195:12. Plaintiffs' Exhibit 8.

71. Jordan Arroyo testified that everyone involved is responsible for figuring out what the problem is. Arroyo Dep. 202:4 – 14. Plaintiffs' Exhibit 8.

72. Jordan Arroyo testified that he would never communicate with rig people and engineers to get information about the tubing or the casing before the job started Arroyo Dep. at 207:12 – 21. Plaintiffs' Exhibit 8.

73. Arroyo further testified that he would not make adjustments to information provided to him from the rig people and engineers. He testified that the rig operator of the company man would make changes. Arroyo Dep. at 208:18 – 210. Plaintiffs' Exhibit 8.

74. Arlen Jones testified that his "primary job function was to go out into the field for our customers, rigging up and operating downhole video equipment and traveling to and from job locations. It also included coordinating with other service companies on location. I was also required to train new hires. I had some involvement in field sales." Jones Dep. at 32:4 – 14.  Arlen Jones described the process of rigging up, setting up the equipment and turning on the camera. Jones Dep. at 32:15 – 33:9.   Arlen Jones testified that the customer turns to the EVO video equipment to show them what the problem is. He testified that he was operating the equipment. Mr. Jones testified that it was not his job to inform the customer what is going on down in their hole or what the issue is downhole. He testified that his job is to show them what is happening in the well. He testified that it was not his decision as to what the problem is. Jones Dep. 33:10 – 34:25 he testified that he shows the customer on the monitor what they have (downhole) and they ascertain what they think is wrong with it. He then would give them a copy of the video of the wellbore. On occasion, using his experience he would explain where they are at. Jones Dep. at 35:9 – 37:14. Plaintiffs' Exhibit 9.

75. Arlen Jones testified that operating the video equipment is a manual job since you are putting together and operating surface equipment and downhole equipment. Jones Dep. at 37:15 – 38:2. He further testified that he did not believe that a certain amount skill was required to operate the computer to operate the camera. Jones Dep. at 38:3 – 23. Plaintiffs' Exhibit 9.

76. Arlen Jones testified that his role on location was to run video camera. He testified that the typical jobs would last from six to twelve hours. He testified that while every well site was different, you operate the video equipment in the same way. The only thing that would be operated differently would be preparing the well before the video cameras were used. This would include determining whether fluid or gas would be used to

prepare the well. He testified that inevitably the company man would make this decision. He testified that he would not give the company man recommendations as to how to prep the well. He testified that when the company man preps the well that he would come in and run the video. He testified that he didn't provide any suggestions for prepping of the well. He testified that this was done by the customer and the manager who took the call. He testified that he would show up on location and operate the video camera and show the customer what they are looking at. Jones Dep. at 40:17 – 43:10. Plaintiffs' Exhibit 9.

77. Arlen Jones testified that on one occasion out of ten they may not be able to get a video. He testified that he would not make recommendations to the customer as to how to get the video when that occurred. Jones Dep. at 46:22 – 47:10. Plaintiffs' Exhibit 9.

78. Arlen Jones testified that he would coordinate with water people on location, but that he was not responsible for this. He testified that the customer is responsible for making sure that everyone is doing their job. Jones Dep. at 48:7 – 25; 49:4 – 10. Plaintiffs' Exhibit 9.

79. Ron Lee was in the training process for about six months until he was approved to start doing jobs on his own. Lee Dep. at 44:2 – 11. Plaintiffs' Exhibit 6.

80. Before the cameras were run down the hole, the field engineers responsible for getting the equipment prepared, testing it and getting it rigged up. Lee Dep. at 46:15 – 25. Plaintiffs' Exhibit 6.

81. Ron Lee testified that the company representative is often sitting next to him in watching the video being recorded. He testified that sometimes it's very obvious what is being shown on the video and sometimes it is not. Ron Lee testified that he relies on the customer for information they have available. He testified that he relies heavily on the customer and in some cases on third party experts. In most cases, he relies heavily on information provided by the customer. In response to a question of whether he was able to kind of interpret what you're looking at on the screen if it's not obvious, Ron Lee testified that "collectively if we can usually come up to reasonable conclusion of what they were looking at." Collectively included the field representative, whatever tool hands may be present, subject matter experts on site and rig hands who have been there during the process of when the scenario may have happened. Ron Lee testified that he gives some recommendations, but not if he is not sure. Lee Dep. at 50:11 – 54:1. When asked if he viewed this process as a quality control service to the customer by allowing them to identify what the problem is, Ron Lee testified that it was informative and sometimes follow-up. Lee Dep. at 54:2 – 8. Plaintiffs' Exhibit 6.

82. Ron Lee testified that some parts of his job are somewhat technical and parts of it are manual. He testified that everything leading up to running the tool in the hole and everything after is manual. This includes rigging up the equipment and rigging down the equipment. He did not feel that operating the computer was technical, but rather one part of the job. Lee Dep. at 75:7 – 76:12. Plaintiffs' Exhibit 6.

83. The main part of Ron Lee's job is to be a hand out in the field to run tools. Lee Dep. at 76:13 – 16. The main service he is provided to the customer is the video of their well. Lee Dep. at 76:22 – 77:9. He testified that the endgame is getting the video to the customer. Lee Dep. at 78:5 – 7. Plaintiffs' Exhibit 6.

84. Ron Lee testified that when he worked in the shop, he would service tools, clean tools and fix tools. Lee Dep. at 149:7 – 17; 149:14 – 17. Plaintiffs' Exhibit 6.

85. Ron Lee testified that he does not make sales calls from the shop or go out and make sales calls. Lee Dep. at 153:22 – 154:2. Plaintiffs' Exhibit 6.

86. Jerod Hobbs testified that he did not have authority levels for a manager and that he was not a manager. Hobbs Dep. 41:1-8. Jerod Hobbs testified that he did not have managerial duties. He testified that he did not supervise anyone, he does not have say on pay raises, and he does not perform reviews.  He testified that he is a field hand. Hobbs Dep. 41:1-42:2. Plaintiffs' Exhibit 7.

87. According to Jerod Hobbs, when he was running a job, he would go to location, rig up the tools have a safety meeting, rig up the tool to the wireline truck, make the tool vertical when picked up by the wireline truck, stick the tool in the well, go to the depth the consultant or engineer has in mind and see if you can identify what you were called to the well for. Hobbs Dep. at 54:14 – 55:13. Plaintiffs' Exhibit 7.

88. Jerod Hobbs was initially hired with the title of West Virginia base manager but testified that he never had that role.  He had that title from 2011 until 2016. Hobbs Dep.at 82:17 – 83:10. Hobbs moved from West Virginia to Oklahoma in July, 2013. Hobbs Dep. 124:23 – 125:1. Plaintiffs' Exhibit 7.

89. In 2013, Jerod Hobbs moved to Oklahoma. He testified that in Oklahoma, he did not view the sales part of his job as an important function of his job. He testified that his main focus is to do the (field) job, but he would assist the sales team when he could. Hobbs Dep. at 97:4 – 22. Plaintiffs' Exhibit 7.

90. Hobbs testified that he knew how to fill up paperwork for quotes but would defer to Troy Sutherlin or call Arthur White his supervisor first. Hobbs Dep. at 118:7 – 119:2. Providing opinions about appropriate quotes for clients on jobs was not required as part of his responsibilities, but he participated and provided opinions in that process. Hobbs Dep. at 119:19 120:5. Plaintiffs' Exhibit 7.

91. If Jerod Hobbs received communication from a customer regarding concerns about quotes, he would usually put them in touch with Troy Sutherlin because Troy Sutherlin had the authority and he did not. Hobbs Dep. at 122:21 – 123:11. Plaintiffs' Exhibit 7.

92. When Hobbs worked in the shop, he would clean tools, dress tools or clean the shop. Occasionally he would prepare reports. Hobbs Dep. 170:1 – 8. Plaintiffs' Exhibit 7.

93. Hobbs testified that he believed he was nonexempt because he did not have managerial duties. He did not have the ability to hire or fire, change rate of pay, direct employees or any say in the operation of the company. Hobbs Dep. 180:13 – 181:10. Plaintiffs' Exhibit 7.

94. Francis Neill was a director of EVO Incorporated from 2011 until 2015. Neill Dep. 14:5 – 12. Plaintiffs' Exhibit 17.

95. EVO Incorporated was incorporated because E V. Offshore Limited wanted to start operations in the United States. Neill Dep. at 27:17 – 24. EVO was formed to conduct downhole video services in the United States. Neill Dep. at 28:10 – 16. Neill was involved in setting up the organizational structure for EVO. Neill Dep. at 28:17 – 19. Neill was the Chief Executive of EV Offshore Limited and EVO Incorporated was a wholly owned subsidiary of that company. Neill Dep. at 30:21 – 31:4. Neill testified that he had a high-level global perspective of the FLSA and was aware of the major components of exempt, nonexempt differentiation. He was aware that nonexempt employees are eligible for overtime and exempt employees are typically not pay overtime. He did not know the specifics for determining exemptions. Neill Dep. at 33:6 – 34:13. He does not know the specifics for exemptions under the FLSA. Neill Dep. at 35:9 – 11; 20 – 25. Plaintiffs' Exhibit 17.

96. Neill testified that when EVO was incorporated he knew they had to comply with the laws of the United States and was aware of the words FLSA. He testified he was also aware of the definition between exempt or nonexempt and that people need to be in one of those categories. He testified that he delegated the responsibility to determine whether employees are exempt v. nonexempt under the FLSA to the manager they recruited, Troy Sutherlin. Neill Dep. at 36:11 – 37:17. Plaintiffs' Exhibit 17.

97. In conversations with Troy Sutherlin, Neill assumed that the field engineers would be exempt because of their salary, ability to influence revenue on the well site, working independently and making material decisions for the company. Neill Dep. at 39:13 – 25. He did not personally know whether that would qualify as an exemption under the FLSA. Neill Dep. at 40:12 – 20; 41:4 – 9. He did not seek counsel from an attorney familiar with the Fair Labor Standards Act to determine whether or not field engineers would be exempt from payment of overtime under the act. Neill Dep. at 41:16 – 20. He did not contact a human resources specialist to determine whether field engineers would be exempt or nonexempt under the FLSA. Neill Dep. at 41:21 – 25. During the time he was providing the executive role for EVO Incorporated he did not have any other conversations about whether field engineers would be exempt or nonexempt under the FLSA. Neill Dep. at 43:2 – 9. Plaintiffs' Exhibit 17.

98. Field engineers were not required to have an advanced degree. Neill Dep. at 50:23 – 51:6. Plaintiffs' Exhibit 17.

99. Jordan Arroyo was not involved in overall management of EVO Incorporated. Neill Dep. at 54:17 – 22. Plaintiffs' Exhibit 17.

100. Neill testified that sales would be part of the field engineers' responsibilities, but not their primary job duty. Neill 56:2 – 9. Plaintiffs' Exhibit 17.

101. The most important duty of a field engineer would be recording downhole video and securing the data for the customer according to Francis Neill. Neill Dep. at 56:11 – 15. Field engineers had a manual that covered technical operations of the camera. Neill Dep. at 57:25 – 58:11. Plaintiffs' Exhibit 17.

102. Neill testified that it its essential level, EVO Incorporated field engineers would go out to the well site and record video data from downhole zones in the well bore. Neill Dep. at 60:2 – 5. Plaintiffs' Exhibit 17.

103. Ron Lee was recruited as a field engineer, which involved sales, but sales were not his primary duty. Neill Dep. at 60:21 – 61:1. Plaintiffs' Exhibit 17.

104. Field engineers for EVO Incorporated did not have the responsibility to set and adjust hours of work for other employees. Neill 66:8 – 12. Plaintiffs' Exhibit 17.

105. Field engineers for EVO Incorporated did not have the responsibility to set and adjust hours of work for other employees. Neill 66:8 – 12. Plaintiffs' Exhibit 17.

106. Field engineers were not responsible for handling employee complaints and grievances for EVO. Neill Dep. at 66:22 – 25. Plaintiffs' Exhibit 17.

107. Field engineers were not responsible for disciplining other employees for EVO. Neill Dep. at 67:1 – 3. Plaintiffs' Exhibit 17.

108. Field engineers would not have the right to hire and fire employees. Neill Dep at 68:17 – 19. Plaintiffs' Exhibit 17.

109. Field engineers could not approve authorities for expenditure. Neill 89:5 – 7. Plaintiffs' Exhibit 17.

110. In addressing the email from Jenna McGowen to Arthur White (Plaintiffs' Exhibit 13), Francis Neill initially agreed that salary alone does not define whether an employee is exempt or nonexempt. Neill Dep. at 113:17 – 114:8; 114:18 – 22. He subsequently testified that he believed that salary alone if high enough would be a reason for exempting an employee from payment of overtime standing alone. Neill Dep. at 115:16 – 24. Plaintiffs' Exhibit 17.

111. EVO Incorporated did not rely on any written or administrative regulations, orders, rulings, approvals, interpretations, practices or enforcement policies of the wage and hour division of the United States Department of Labor except as to a case involving sales tax issues. Neill Dep. at 121:5 – 17. Plaintiffs' Exhibit 17.

112. Field engineers would not make decisions about what steps will be taken after recording downhole video or data. They are not completion engineers on wells. The company man as responsibility for the well and is the only person that can make decisions on what happens on the well. Neill Dep. at 131:14 – 132:7. Plaintiffs' Exhibit 17.

113. Arthur White testified that the criteria for determining whether employees are exempt versus nonexempt under the FLSA was whether the employee had responsibility over others, could act independently and is also an advisor. White Dep. at 22:4 – 18. He also believed that any salary over $100,000 as exempt. He was aware of a list of automatic exemptions but did not recall the specific list. White Dep. at 23:3 – 20. Plaintiffs' Exhibit 12.

114. At ExPro, field engineers were treated as nonexempt and paid overtime. White Dep. at 24, 8 – 25:2. Plaintiffs' Exhibit 12.

115. Arthur White testified that there is a component of manual work in every single job that a field engineer does for EVO Incorporated. White Dep. at 33:7 – 18.

116. Field engineers do not customarily and regularly supervise two or more full time employees. White Dep. at 33:20 – 23. Plaintiffs' Exhibit 12.

117. Field engineers had responsibility to rig up the cameras, rig down the cameras, load equipment on location, unload equipment on location and maintain equipment their using the oilfield. White Dep. at 33:24 – 34:15. Field engineers have preventative maintenance schedules and operational manuals that can be referenced in performing downhole video work. White Dep. at 35:9 – 13. Field engineers have general guidelines that they follow in their work in recording downhole video although they do need to be able to adapt as well. White Dep. at 38:3 – 50. Plaintiffs' Exhibit 12.

118. Ron Lee held the position of trainee for 5 or 6 months. White Dep. at 39:6 – 9. Plaintiffs' Exhibit 12.

119. Field engineers do not have the authority to formulate management policies or create those policies for EVO Incorporated. White Dep. at 46:8 – 12. Field engineers cannot unilaterally change management policies for EVO. White Dep. at 46:22 – 47:1. Plaintiffs' Exhibit 12.

120. Field engineers cannot enter into contracts on behalf of EVO or negotiate or assign master service agreements for EVO Incorporated. White Dep. at 47:16 – 24. Field engineers are not required to have advanced scientific or technical degree to go to work for EVO Incorporated. White Dep. at 49:1 – 4. The goal for EVO Incorporated is to record downhole video. White Dep. at 50:17 – 51:5. Plaintiffs' Exhibit 12.

121. The company representative has final authority on what happens at the well, including what zones will be recorded. White Dep. at 52:12 – 53:17. Plaintiffs' Exhibit 12.

122. Sales are part of Jerod Hobbs job, but his primary duty for EVO Incorporated is not making sales. White Dep. at 54:22 – 25.  It was not the primary duty for Ron Lee, Arlen Jones or Jordan Arroyo to make sales. White Dep. at 55:1 – 10. Plaintiffs' Exhibit 12.

123. The techniques used by EVO Incorporated in recording downhole video within company are generally well-established. White Dep. at 73:20 – 25. Plaintiffs' Exhibit 12.

124. Arthur White testified that Jerod Hobbs did not currently have responsibility for managing any division of EVO Incorporated. He also testified that Ron Lee, Jordan Arroyo and Arlen Jones never had responsibility for managing any division of EVO Incorporated. White Dep. at 94:7 – 95:6. Plaintiffs' Exhibit 12.

125. None of the plaintiffs had responsibility for setting and adjusting rates of pay and hours of work for other employees, routinely directing the work of other employees, evaluating the employee's productivity and efficiency, recommending promotions or change of work status, handling employee complaints and grievances for EVO Incorporated or for disciplining other employees for EVO Incorporated. 96:13 – 97:13. Plaintiffs' Exhibit 12.

126. Troy Sutherlin was the manager for Jerod Hobbs and Arlen Jones at X Pro another downhole video company. Field engineers at that company were paid hourly with a field bonus. Sutherlin Dep. at 50:24 – 52:6.

127. Troy Sutherlin's initial position for EVO was vice president operations or VP North American land. Sutherlin Dep. at 57:16 – 21.

128. Other companies in the industry including Halliburton, Hitwell and TTS work on an hourly basis. These companies operate cameras or run tools. Sutherlin Dep. at 67:9 – 23.

129. Troy Sutherlin explained the role that field engineers provide when called to well. He testified that customers are wanting to verify what they know or don't know regarding the downhole situation. The field engineer provides information as to "what's going on the day". They would provide the picture and the issue that is shown on the video that day at that moment in time. The field engineer would provide the picture and invoice. The field engineer would annotate the video for documentation purposes. Troy Sutherlin testified that field engineers were the "rock stars of the industry" because of their long work hours, doing what is necessary to get the job done, and working through multiple shifts. Sutherlin Dep. at 106:16 – 110:9.

130. The field engineers are not a key part and servicing the well, there are a key part in obtaining data when the running the downhole video. He testified that it was similar to running a logging tool in the hole. A field engineer runs the tools and then gives the data to the engineer and the unit engineer proceeds from there. Sutherlin Dep. at 110:13 – 110:22.

131. Field engineers did not provide quotes to customers when they worked for Troy Sutherlin. Sutherlin Dep. at 110:23 – 111:4.

132. Field engineers are not responsible for the fluid in the well. They checked the fluid until the consultant whether or not it's going to work. Sutherlin Dep. at 116:14 – 21.

133. Jordon Arroyo was a trainee for almost two years. Troy Sutherlin did not know if Jordan Arroyo ever actually broke out 100% on his own. Troy Sutherlin viewed him as a trainee during the entire time he was employed by Evo Incorporated. Jordan Arroyo was not hired to be an outside salesperson. He was not hired to be in management, to be an administrator or to be an executive. Sutherlin Dep. at 151:19 – 152:12. Troy Sutherlin testified that there was "quite a bit of manual labor involved in the job" for field engineers. Sutherlin Dep. at 153:4 – 7. Troy Sutherlin testified that Jordan Arroyo would have had a significant amount of manual labor as a trainee for Evo Incorporated. He further described the nature of that manual labor. Sutherlin Dep. at 153:8 – 25. Troy Sutherlin testified that Jordan Arroyo did not exercise discretion and independent judgment regarding well site operation because he was a trainee that just never got there and never made it to the next level. Sutherlin Dep. at 154:1 – 15. Sutherlin testified that field engineers were provided well established techniques and procedures and standards for doing the job of downhole video tools in the United States. Sutherlin Dep. at 154:16 – 155:2.

134. Sutherlin testified that field engineers provided customers video on thumb drive. He testified that customers purchasing the actual data which is given to them. Sutherlin Dep. at 156:7 – 19. Field engineers would not make downhole completion decisions for the customers. Sutherlin Dep. at 156:20 – 23 they are not allowed to make downhole completion decisions for the customers Sutherlin Dep. at 156:24 – 157:1. Troy Sutherlin would not allow a field engineer working under his supervision to make downhole completion decisions for customers. Sutherlin Dep. at 157:2 – 5. Plaintiffs' Exhibit 16.

135. A field engineer's primary duty was not the performance of office or nonmanual work directly related to the management or general business operations of EVO Incorporated or their customers. Sutherlin Dep. at 159:25 – 160:5. Plaintiffs' Exhibit 16.

136. Field engineers did not have the authority to formulate management policies or operating practices for EVO Incorporated. Sutherlin Dep. at 160:7 – 12. Plaintiffs' Exhibit 16.

137. Field engineers did not have the authority or responsibility to negotiate the price for downhole video jobs. Sutherlin Dep. at 161:12 – 15. Field engineers did not have the authority to make financial commitments on behalf of EVO Incorporated on the jobsite. Sutherlin Dep. at 161:24 – 162:3. Plaintiffs' Exhibit 16.

138. Field engineers would have to contact Troy Sutherlin when he was in charge to waive or deviate from established policies/practices of EVO Incorporated in recording

downhole video for anything that was major before those changes were made. Sutherlin Dep. at 166:19 – 167:3. Plaintiffs' Exhibit 16.

139. Field engineers would not represent EVO in handling complaints or disputes are problems with the customer on location regarding billing. Sutherlin Dep. at 169:7 – 11. Plaintiffs' Exhibit 16.

140. Field engineers for EVO Incorporated would not represent EVO in handling complaints, disputes, problems regarding the operations for recording the downhole video. Sutherlin Dep. at 160:12 – 16. Plaintiffs' Exhibit 16.

141. Field engineers did not have the authority to affect, interpret or implement management policies or operating practices for EVO Incorporated. Sutherlin Dep. at 160: 13 – 17. Plaintiffs' Exhibit 16.

142. It was not part of the responsibility of field engineers the plan long, medium or short-term business plans or objectives for EVO. They had nothing to do with budgets. Sutherlin Dep. at 160:17 – 25. Field engineers were not involved in long-term planning or short or long-term budgeting. Sutherlin Dep. at 170:1 – 6. Plaintiffs' Exhibit 16.

143. When EVO provides downhole video, they are recording data. Sutherlin Dep. at 170:7 – 11. Plaintiffs' Exhibit 16.

144. Field engineers would have the responsibility for turning the camera on and off to record what shown downhole. Sutherlin Dep. at 170:12 – 18. The idea for field engineers is to get the location, get rigged up, get in the hole, contain data as quickly as possible and get off location. Sutherlin Dep. at 170:20 through 171:12. Plaintiffs' Exhibit 16.

145. Field engineers would put the tools together on location out in the elements where temperatures could range from 110° in the panhandle to -30° in Alaska. Sutherlin Dep. at 175:10 – 19. Field engineers could be on location for eight hours or end up the on location for week and sleeping in their pickup. Sutherlin Dep. at 175:20 – 176:7. Plaintiffs' Exhibit 16.

146. The company man makes the final decision as to when the video operation is completed and if he has what he needs. Sutherlin Dep. at 185:6 – 12. Plaintiffs' Exhibit 16.

147. Troy Sutherlin testified that he was never asked by Francis Neill, Jonathan Thursby, Sam Copeman or Maurice McBride to evaluate the Fair Labor Standards Act as it applied to field engineers. Sutherlin Dep. at 195:1 – 5. Plaintiffs' Exhibit 16.

148. Troy Sutherlin testified that other companies including Xpro, Halliburton and Hitwell had field engineers who had similar responsibilities to those for EVO. He testified that those field engineers were paid hourly with overtime and field bonus. Sutherlin Dep. at 214:20 – 215:17; 215:22 – 217:6. Plaintiffs' Exhibit 16.

149. Troy Sutherlin testified that if field engineer couldn't do their job if they couldn't do manual labor. Sutherlin Dep. at 219:6 – 9. Plaintiffs' Exhibit 16.

150. Defendant Sam Copeman was an employer under the FLSA because he "(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010).

151. Francis Neill was an "employer" under the FLSA. JPO 6.10, Admission of Fact.

152. Defendant Maurice McBride was an employer under the FLSA because he "(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  Williams v. Henagan, 595 F.3d 610, 620 (5th Cir. 2010).

153. Plaintiff Jerod Hobbs' regular rates of pay are found to be the rates as submitted in Plaintiffs' Exhibit 92 – Jerod Hobbs Calculation of Unpaid Overtime.

154. Plaintiff Jerod Hobbs' unpaid overtime hours are found to be the hours as submitted in Plaintiffs' Exhibit 92 – Jerod Hobbs Calculation of Unpaid Overtime.

155. The amount of Plaintiff Jerod Hobbs' unpaid overtime is found to be the amount as submitted in Plaintiffs' Exhibit 92 – Jerod Hobbs Calculation of Unpaid Overtime.

156. Plaintiff Ronald Lee's regular rates of pay are found to be the rates as submitted in Plaintiffs' Exhibit 92 – Ronald Lee Calculation of Unpaid Overtime.

157. Plaintiff Ronald Lee's unpaid overtime hours are found to be the hours as submitted in Plaintiffs' Exhibit 92 – Ronald Lee Calculation of Unpaid Overtime.

158. The amount of Plaintiff Ronald Lee's unpaid overtime is found to be the amount as submitted in Plaintiffs' Exhibit 69 – Ronald Lee Calculation of Unpaid Overtime.

159. Plaintiff Jordon Arroyo's regular rates of pay is determined to be the rates as submitted in Plaintiffs' Exhibit 49 – Jordan Arroyo Calculation of Unpaid Overtime.

160. Plaintiff Jordon Arroyo's unpaid overtime hours are found to be the hours as submitted in Plaintiffs' Exhibit 49 – Jordan Arroyo Calculation of Unpaid Overtime.

161. The amount of Plaintiff Jordon Arroyo unpaid overtime is found to be the amount as submitted in Plaintiffs' Exhibit 49 – Ronald Lee Calculation of Unpaid Overtime.

162. Plaintiff Arlen Jones' regular rates of pay are found to be the rates as submitted in Plaintiffs' Exhibit 36 – Arlen Jones Calculation of Unpaid Overtime.

163. Plaintiff Arlen Jones' unpaid overtime hours are found to be the hours as submitted in Plaintiffs' Exhibit 36 – Arlen Jones Calculation of Unpaid Overtime.

164. The amount of Plaintiff Arlen Jones' unpaid overtime is found to be the amount as submitted in Plaintiffs' Exhibit 36 – Arlen Jones Calculation of Unpaid Overtime.

165. Plaintiff Jerod Hobbs did not share a clear mutual understanding with Defendant EVO that EVO would pay a fixed salary regardless of the hours worked.

166. Plaintiff Ronald Lee did not share a clear mutual understanding with Defendant EVO that EVO would pay a fixed salary regardless of the hours worked.

167. Plaintiff Jordon Arroyo did not share a clear mutual understanding with Defendant EVO that EVO would pay a fixed salary regardless of the hours worked.

168. Plaintiff Arlen Jones did not share a clear mutual understanding with Defendant EVO that EVO would pay a fixed salary regardless of the hours worked.

169. Plaintiff Jerod Hobbs was paid a job bonus for jobs worked which is inconsistent with the fluctuating work week method of calculating unpaid overtime hours. Dacar v. Saybolt, L.P., 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. Dacar v. Saybolt, L.P., No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

170. Plaintiff Ronald Lee was paid a job bonus for jobs worked which is inconsistent with the fluctuating work week method of calculating unpaid overtime hours. Dacar v. Saybolt, L.P., 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. Dacar v. Saybolt, L.P., No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

171. Plaintiff Jordon Arroyo was paid a job bonus for jobs worked which is inconsistent with the fluctuating work week method of calculating unpaid overtime hours. Dacar v. Saybolt, L.P., 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. Dacar v. Saybolt, L.P., No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

172. Plaintiff Arlen Jones was paid a job bonus for jobs worked which is inconsistent with the fluctuating work week method of calculating unpaid overtime hours. Dacar v. Saybolt, L.P., 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. Dacar v. Saybolt, L.P., No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

173.  The attorney's fees and costs as submitted by Plaintiffs' attorney are reasonable and meet the criteria set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974).

## Proposed Conclusions of Law

1.  The FLSA states that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. §207(a)(1).

2.  In an FLSA lawsuit, a successful Plaintiff can recover: (1) back pay in the amount of unpaid minimum wages or overtime compensation; (2) liquidated damages in an amount equal to unpaid wages; and (3) attorneys' fees and costs. 29 U.S.C. § 216.

3.  "…the Labor Department included oil-well drillers in a list of "Blue-Collar Occupations That Are Most Likely Nonexempt" under the regulations." *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,242 (Apr. 23, 2004) (as codified at 29 C.F.R. pt. 541).*Dewan v. M-I, L.L.C.*, 858 F.3d 331, 336 (5th Cir. 2017).

4.  The section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay under the Fair Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be. 29 C.F.R. § 541.3.

5.  29 C.F.R § 541.200(a) describes the general rule for administrative employees in part as follows: "**(a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee: (1) Compensated on a salary or fee basis at a rate of not less than $455 per week; (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

6.  29 CFR § 541.201 is the regulation defining the second criteria as to the administrative exemption - Directly related to management or general business operations.  That

regulation sets forth that: "To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment. (b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption. (c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt."

7.  The Fifth Circuit described the difference between work related and unrelated to management or general business operations as follows:  "Particularly relevant is a case in which we stated thatHN11 the relevant distinction "is between those employees whose primary duty is administering the business affairs of the enterprise [and] those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." [**11]  *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990).*Dewan v. M-I, L.L.C.*, 858 F.3d 331, 336 (5th Cir. 2017).

8.  In responding to an inquiry on whether background investigators fit within the FLSA's administrative exemption, the opinion letter clarified the type of advice an exempt employee provides: the relevant regulation "is directed at advice on matters that involve policy determinations, i.e., how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation." U.S. Dep't of Labor, Wage & Hour Div., Op. Letter (Sept. 12, 1997). Generally, this requires an exempt employee to participate "in important staff functions of the employer or the employer's clients or customers as opposed to the production functions." *Id. Dewan v. M-I, L.L.C.*, 858 F.3d 331, 337 (5th Cir. 2017)

9.  To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.29 C.F.R. § 541.202(a)

Case 4:16-cv-00770   Document 99   Filed on 05/28/19 in TXSD   Page 22 of 31

10. The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.29 C.F.R § 541.202(e).

11. The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. 29 C.F.R. § 541.202.

12. The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. See also § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."29 C.F.R. § 541.202.

13. Analysis of the administrative exemption set forth in 29 C.F.R. § 541.200(2) and (3) "require(s) a fact-finder to analyze the facts to determine the employee's primary duty, how the work directly relates to certain parts of the employer's business, and whether the duty involves some discretion and independence." *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)

14. An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly.29 CFR 541.202.

15. "In responding to an inquiry on whether background investigators fit within the FLSA's administrative exemption, the opinion letter clarified the type of advice an exempt employee provides: the relevant regulation "is directed at advice on matters that involve policy determinations, i.e., how a business should be run or run more efficiently, not

merely providing information in the course of the customer's daily business operation." U.S. Dep't of Labor, Wage & Hour Div., Op. Letter (Sept. 12, 1997). Generally, this requires an exempt employee to participate "in important staff functions of the employer or the employer's clients or customers as opposed to the production functions." Id Dewan v. M-I, L.L.C., 858 F.3d 331, 337 (5th Cir. 2017).

16. The final criterion for the administrative exemption requires that an employee's primary duty "include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). The phrase "matters of significance" is defined to "refer[] to the level of importance or consequence of the work performed." *Id.* Additionally, the regulations require that the "exercise of [**17] discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." § 541.202(e). Notably, "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." § 541.202(c).HN15

The regulations provide a non-exclusive list of factors relevant to this criterion. Included are "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; [and] whether the employee has authority to negotiate and bind the company on significant matters[.]" § 541.202(b). The employee's degree of discretion must be considered "in the light of all the facts involved in the particular employment situation in which the question arises." *Id. Dewan v. M-I, L.L.C., 858 F.3d 331, 338 (5th Cir. 2017).*

17. An employee is exempt  as a "highly compensated employee" if (1) the employee receives total annual compensation of at least $100,000; (2) the employee's primary duty includes performing office or non-manual work, and (3) the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an ….administrative…employee"  29 C.F.R. § 541.601.

18. The highly compensated employee exception "applies only to employees whose primary duty includes performing office or non-manual work. Thus, for example, non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy are not exempt under this section no matter how highly paid they might be." 29 C.F.R. § 541.601(d).

19. An employees' primary duty is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).

20. The determination of primary duty "must be based on all the facts of a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a)

21. Manual labor is work involving physical skill and energy and repetitive operations with the hands.  29 C.F.R. § 541.3(a).

22. The outside-sales exemption exempts "any employee employed….in the capacity of outside salesman."  29 U.S.C. § 213(a)(1).

23. The outside sales exemption covers any employee whose primary duty is making sales or obtaining orders or contracts and who is customarily and regularly away from the employer's place of business in performing such primary duty.  See:  29 C.F. R. § 541.500(a).

24. 29 CFR 541.705 provides that: (a) 29 USC 213(a)(1) exemptions do not apply to employees training for employment in an executive, administrative, professional, outside sales, or computer employee capacity who are not actually performing the duties required for exemption as a bona fide executive, administrative, professional, outside sales, or computer employee.

25. A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part. 29 C.F.R. § 541.2

26. "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.  29 U.S.C. § 203(d).

27. The term "employ" simply means "suffer or permit to work." 29 U.S.C. § 203(g).

28. The "economic reality test" has arisen to determine whether there is an employer/employee relationship. The 5th Circuit applies  the four standard factors under the economic reality test, *i.e.,* whether the putative employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.  *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010).

29. In an FLSA lawsuit, a successful Plaintiff can recover: (1) back pay in the amount of unpaid minimum wages or overtime compensation; (2) liquidated damages in an amount equal to unpaid wages; and (3) attorneys' fees and costs. 29 U.S.C. § 216.

30. The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid. 29 C.F.R. § 778.109.

31. Salary for periods other than workweek. Where the salary covers a period longer than a workweek, such as a month, it must be reduced to its workweek equivalent. A monthly salary is subject to translation to its equivalent weekly wage by multiplying by 12 (the number of months) and dividing by 52 (the number of weeks). A semimonthly salary is translated into its equivalent weekly wage by multiplying by 24 and dividing by 52. Once the weekly wage is arrived at, the regular hourly rate of pay will be calculated as indicated above. The regular rate of an employee who is paid a regular monthly salary of $ 1,560, or a regular semimonthly salary of $ 780 for 40 hours a week, is thus found to be $ 9 per hour.29 C.F.R. § 778.113.

32. "… a plaintiff is entitled to overtime pay for any week in which he worked in excess of 40 hours. To determine the amount of overtime compensation due, the district court should first determine a plaintiff's regular hourly rate of pay by dividing the total amount of remuneration paid in a workweek (*including incentive payments*) by the total number of hours intended to be compensated (which, in this case, is the total number of hours actually worked) in that workweek. *See* 29 C.F.R. § 778.207(b). The district should then compute the overtime rate by multiplying the regular rate times 1.5. The overtime rate should then be multiplied by the number of overtime hours worked in the workweek to arrive at the total amount of overtime compensation due for that week. Finally, that total amount should be reduced by the amount of overtime pay the plaintiff has already received from Saybolt for that workweek. *See* 29 U.S.C. § 207(h) (describing which sums may be creditable [*3] toward overtime compensation). The remainder is the amount of overtime compensation due to the plaintiff." *Dacar v. Saybolt, L.P.*, No. 16-20751, 2019 U.S. App. LEXIS 3345, at *2-3 (5th Cir. 2019) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

33. "the FLSA generally requires that employees be paid an overtime premium of one and one-half times the "regular rate of pay" for all hours worked in excess of the 40-hour workweek. 29 U.S.C. § 207(a)(1). Although an employer may satisfy this requirement by using the FWW method, courts require four prerequisites for its use:(1) the employee's hours must fluctuate from week to week;(2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums); [**11] (3) the fixed amount must provide compensation every week at a regular rate at least equal to the minimum wage; and(4) the employer and employee must share a clear mutual understanding that the employer will pay the fixed salary regardless of the number of hours worked." *Brantley v. Inspectorate Am. Corp.*, 821 F. Supp. 2d 879, 888 (S.D. Tex. 2011) (citing 29 C.F.R. § 778.114(a), (c); *O'Brien v. Town of Agawam*, 350 F.3d 279, 288 (1st Cir. 2003)). HN4 The plaintiffs have the burden of proving noncompliance. See *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 636 (5th Cir. 2001). *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 920 (5th Cir. 2018) Modified and

rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.*, No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

34. "Indeed, despite the proposed regulations that Saybolt relied on, HN6 the DOL ultimately decided against the amendment in 2011 and issued a final rule stating that incentive payments are "incompatible with the fluctuating workweek method" and that it would not "be appropriate to expand the use of this method of computing overtime pay beyond the scope of the current regulation." See Updating Regulations Issued Under the Fair Labor Standards Act, 76 Fed. Reg. 18832, 18848-50 (April 5, 2011). The final rule noted that changing the regulations could cause "employers to pay a greatly reduced fixed salary and shift a large portion of employees' compensation into [**13] bonus and premium payments, potentially resulting in wide disparities in employees' weekly pay." See 76 Fed. Reg. at 18850. As noted, such disparities in weekly straight-time pay are incompatible with the "fixed salary" requirement." *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

35. This requirement of a "fixed salary" has existed since § 778.114(a) was adopted in 1968. The final rule issued by the DOL in 2011 did not change the regulation. Instead, the rule concluded that a proposed regulation allowing inclusion of bona fide bonus payments and/or premium payments in the calculation of the regular rate was "incompatible with the fluctuating workweek method of computing [**27] overtime under section 778.114." 76 Fed. Reg. at 18850. *Dacar v. Saybolt, L.P.,* 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.*, No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

36. "The FLSA provides that liquidated damages be awarded for FLSA violations in an amount equal to the actual damages. 29 U.S.C. § 216(b). A district court may, "in its sound discretion," refuse to award liquidated damages if the employer demonstrates good faith and reasonable grounds for believing it was not in violation. 29 U.S.C. § 260. Whereas the burden is on the plaintiffs to show [**28] willfulness, Saybolt bears the "substantial burden" of proving the reasonableness of its conduct. See *Ransom v. M. Patel Enters., Inc*., 734 F.3d 377, 387 n.16 (5th Cir. 2013) (citing *Singer*, 324 F.3d at 823).*Dacar v. Saybolt, L.P.,* 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

37. "Indeed, this court has held that, "[e]ven if the district court determines that the employer's actions were taken in good faith and based on reasonable grounds, the district court still retains the discretion to award liquidated damages." *Heidtman v. Cty. of El Paso,* 171 F.3d 1038, 1042 (5th Cir. 1999) (citing *Lee v. Coahoma Cty*., 937 F.2d 220, 227 (5th Cir. 1991)). Accordingly, Saybolt has failed to show that the district court abused its discretion. *Dacar v. Saybolt, L.P.*, 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

38. What constitutes good faith on the part of an employer and whether he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act are mixed questions of fact and law, which should be determined by objective tests. n139 Where an employer makes the required showing, it is for the court to determine in its sound discretion what would be just according to the law on the facts shown. 29 CFR § 790.22(c).

39. Plaintiff Jerod Hobbs was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the administrative exemption. 29 C.F.R § 541.200(a).

40. Plaintiff Jerod Hobbs was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the highly compensated employee exemption. 29 C.F.R. § 541.601.

41. Plaintiff Jerod Hobbs was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the outside sales exemption. 29 U.S.C. § 213(a)(1).

42. Plaintiff Ronald Lee was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the administrative exemption. 29 C.F.R § 541.200(a).

43. Plaintiff Ronald Lee was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the highly compensated employee exemption. 29 C.F.R. § 541.601.

44. Plaintiff Ronald Lee was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the outside sales exemption. 29 U.S.C. § 213(a)(1).

45. Plaintiff Jordon Arroyo was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the administrative exemption. 29 C.F.R § 541.200(a).

46. Plaintiff Jordon Arroyo was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the highly compensated employee exemption. 29 C.F.R. § 541.601.

47. Plaintiff Jordon Arroyo was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the outside sales exemption. 29 U.S.C. § 213(a)(1).

48. Plaintiff Arlen Jones was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the administrative exemption. 29 C.F.R § 541.200(a).

49. Plaintiff Arlen Jones was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the highly compensated employee exemption. 29 C.F.R. § 541.601.

50. Plaintiff Arlen Jones was not exempt from the overtime pay requirements of the Fair Labor Standards Act pursuant to the outside sales exemption. 29 U.S.C. § 213(a)(1).

51. Plaintiffs' overtime should be calculated as stated by the Court in Dacar v. Saybolt, L.P., 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied.  Dacar v. Saybolt, L.P., No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019) as follows:

> "The Court further substitutes the last footnote of its opinion with the following footnote:
>
> As set forth above, a plaintiff is entitled to overtime pay for any week in which he worked in excess of 40 hours. To determine the amount of overtime compensation due, the district court should first determine a plaintiff's regular hourly rate of pay by dividing the total amount of remuneration paid in a workweek (including incentive payments) by the total number of hours intended to be compensated (which, in this case, is the total number of hours actually worked) in that workweek. See 29 C.F.R. § 778.207(b). The district should then compute the overtime rate by multiplying the regular rate times 1.5. The overtime rate should then be multiplied by the number of overtime hours worked in the workweek to arrive at the total amount of overtime compensation due for that week. Finally, that total amount should be reduced by the amount of overtime pay the plaintiff has already received from Saybolt for that workweek. See 29 U.S.C. § 207(h) (describing which sums may be creditable [*3] toward overtime compensation). The remainder is the amount of overtime compensation due to the plaintiff."

52. Plaintiff Jerod Hobbs' regular rates of pay are found to be the rates as submitted in Plaintiffs' Exhibit 92 – Jerod Hobbs Calculation of Unpaid Overtime.

53. Plaintiff Jerod Hobbs' unpaid overtime hours are found to be the hours as submitted in Plaintiffs' Exhibit 92 – Jerod Hobbs Calculation of Unpaid Overtime.

54. The amount of Plaintiff Jerod Hobbs' unpaid overtime is found to be the amount as submitted in Plaintiffs' Exhibit 92 – Jerod Hobbs Calculation of Unpaid Overtime.

55. Plaintiff Ronald Lee's regular rates of pay are found to be the rates as submitted in Plaintiffs' Exhibit 69 – Ronald Lee Calculation of Unpaid Overtime.

56. Plaintiff Ronald Lee's unpaid overtime hours are found to be the hours as submitted in Plaintiffs' Exhibit 69 – Ronald Lee Calculation of Unpaid Overtime.

57. The amount of Plaintiff Ronald Lee's unpaid overtime is found to be the amount as submitted in Plaintiffs' Exhibit 69 – Ronald Lee Calculation of Unpaid Overtime.

58. Plaintiff Jordon Arroyo's regular rates of pay are found to be the rates as submitted in Plaintiffs' Exhibit 49 – Jordan Arroyo Calculation of Unpaid Overtime.

59. Plaintiff Jordon Arroyo's unpaid overtime hours are found to be the hours as submitted in Plaintiffs' Exhibit 49 – Jordan Arroyo Calculation of Unpaid Overtime.

60. The amount of Plaintiff Jordon Arroyo unpaid overtime is found to be the amount as submitted in Plaintiffs' Exhibit 49 – Ronald Lee Calculation of Unpaid Overtime.

61. Plaintiff Arlen Jones' regular rates of pay are found to be the rates as submitted in Plaintiffs' Exhibit 36 – Arlen Jones Calculation of Unpaid Overtime.

62. Plaintiff Arlen Jones' unpaid overtime hours are found to be the hours as submitted in Plaintiffs' Exhibit 36 – Arlen Jones Calculation of Unpaid Overtime.

63. The amount of Plaintiff Arlen Jones' unpaid overtime is found to be the amount as submitted in Plaintiffs' Exhibit 36 – Arlen Jones Calculation of Unpaid Overtime.

64. Plaintiff Jerod Hobbs did not share a clear mutual understanding with Defendant EVO that EVO would pay a fixed salary regardless of the hours worked so the fluctuating work week method of calculating overtime compensation should not be applied. *Dacar v. Saybolt, L.P.,* 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

65. Plaintiff Ronald Lee did not share a clear mutual understanding with Defendant EVO that EVO would pay a fixed salary regardless of the hours worked so the fluctuating work week method of calculating overtime compensation should not be applied. *Dacar v. Saybolt, L.P.,* 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P*., No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

66. Plaintiff Jordon Arroyo did not share a clear mutual understanding with Defendant EVO that EVO would pay a fixed salary regardless of the hours worked so the fluctuating work week method of calculating overtime compensation should not be applied. *Dacar v. Saybolt, L.P.,* 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P*., No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

67. Plaintiff Arlen Jones did not share a clear mutual understanding with Defendant EVO that EVO would pay a fixed salary regardless of the hours worked so the fluctuating work week method of calculating overtime compensation should not be applied. *Dacar v. Saybolt, L.P.,* 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

174. Plaintiff Jerod Hobbs was paid a job bonus for jobs worked which is inconsistent with the fluctuating work week method of calculating unpaid overtime hours. *Dacar v. Saybolt, L.P.,* 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

175. Plaintiff Ronald Lee was paid a job bonus for jobs worked which is inconsistent with the fluctuating work week method of calculating unpaid overtime hours. *Dacar v. Saybolt, L.P.,* 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.*, No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

176. Plaintiff Jordon Arroyo was paid a job bonus for jobs worked which is inconsistent with the fluctuating work week method of calculating unpaid overtime hours. *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

177. Plaintiff Arlen Jones was paid a job bonus for jobs worked which is inconsistent with the fluctuating work week method of calculating unpaid overtime hours. *Dacar v. Saybolt, L.P.,* 914 F.3d 917, 920 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt, L.P.,* No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

178. Defendant have failed to establish that their actions were "in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended," 29 U.S.C. § 260.

179. Since Defendants failed to establish that their actions were "in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the Court may, in its sound discretion, awards liquidated damages to each Plaintiff in the amount of their unpaid overtime." 29 U.S.C. §260.

180. The Court still retains the discretion to award liquidated damages"[e]ven if the district court determines that the employer's actions were taken in good faith and based on reasonable grounds." *Heidtman v. Cty. of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999) (citing *Lee v. Coahoma Cty.,* 937 F.2d 220, 227 (5th Cir. 1991)). Accordingly, Saybolt has failed to show that the district court abused its discretion." *Dacar v. Saybolt, L.P.,* 907 F.3d 215, 229 (5th Cir. 2018) Modified and rehearing denied and Rehearing, en banc, denied. *Dacar v. Saybolt,* L.P., No. 16-20751, 2019 U.S. App. LEXIS 3345 (5th Cir. 2019).

181. Plaintiffs are the prevailing parties and should be awarded their attorney's fees and costs as submitted by Plaintiffs' attorney are found to be reasonable and meet the criteria set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974).

Respectfully submitted,


*/s/ John David Hart*
JOHN DAVID HART
Southern District No. 9018
Texas State Bar No. 09147700
THE LAW OFFICES OF JOHN DAVID HART
5750 Edwards Ranch Road
Fort Worth, Texas 76109
(817) 870-2102 – telephone
(817) 332-5858 – facsimile
johnhart@hartlaw.com
**ATTORNEY FOR PLAINTIFFS**



## CERTIFICATE OF SERVICE

This is to certify that on this the 28th day of May, 2019, a true and correct copy of the above and foregoing document was served electronically through the Court's ECF System to all parties of record.

*/s/John David Hart*
JOHN DAVID HART