IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **JEROD HOBBS,** *et al,,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 4:16-CV-00770** |
| | ) | |
| **EVO INCORPORATED,** *et al,* | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' CLOSING BRIEF**

TO THE HONORABLE JUDGE OF SAID COURT:

**I.  INTRODUCTION**

At the beginning of trial, Defendants predicted that Plaintiffs would offer an incomplete

picture of their job and present an inaccurate account of their work hours as Field Engineers at

EVO. By the close of evidence, Defendants' predictions proved to be correct. Despite Plaintiffs'

best efforts to distort their job duties, the evidence at trial proved that Plaintiffs were exempt

employees. Plaintiffs managed and carried out every critical aspect of downhole camera projects

for EVO's customers—from planning, to execution, and beyond. The crux of their work was

clearly non-manual and involved highly specialized analysis and diagnosis of customer well

conditions. Plaintiffs were consultants to EVO's customers, working without immediate

supervision, and used their experience, judgment, and discretion to identify issues and conditions

affecting the customers' well operations. While Plaintiffs performed some manual tasks, the

evidence at trial showed that these tasks were always in service to the primary function they

performed, which was exempt work. Plaintiffs were also customarily and regularly engaged away

from EVO's offices selling and marketing EVO's business and, as the evidence showed, were

highly compensated for their work. Accordingly, Plaintiffs qualified for the Administrative

Exemption and/or the Outside Sales Exemption, and at least three of them (Hobbs, Jones and Lee) qualified for the Highly Compensated Exemption during the period at issue in this case. Moreover, Plaintiffs failed to meet their burden of proving a *prima facie* case of an FLSA violation because they did not (1) offer any reliable evidence regarding alleged overtime hours during the specific workweeks at issue or (2) establish that Copeman qualified as their employer. For all of these reasons, Defendants respectfully request that the Court render judgment in Defendants' favor.

## II.  ARGUMENT AND ANALYSIS

### A.  Administrative Exemption

An "employee employed in a bona fide administrative capacity" includes any employee (1) who is compensated on a salary or fee basis at a rate of not less than $455 per week . . .;[1] (2) whose primary duty is the performance of office *or non-manual* work directly related to the management or general business operations of the employer *or the employer's customers*; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200 (emphasis added). Recently, the United States Supreme Court explicitly rejected the principle that FLSA exemptions are to be construed narrowly and held that courts "have no license to give the exemption[s] anything but a fair reading." *Encino Motorcars, LLC v. Navarro,* 138 S.Ct. 1134, 1142 (2018).

### 1.  Plaintiffs' Primary Duty Was Office or Non-Manual Work Directly Related to the Management or General Business Operations of EVO or EVO's Customers

The second element of the Administrative Exemption looks at whether an employee's primary duty "is the performance of *office __or__ non-manual* work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. §5 41.200(a)(2)(emphasis added). The disjunctive "or" in the regulations is significant and

---

[1] The first element is stipulated and not in dispute.

indicates that traditional office work is not a mandatory condition for the exemption. Rather, an employee can still qualify for the exemption if his primary duty is non-manual work—regardless of the setting. In *Zannikos v. Oil Inspections (U.S.A.), Inc.*, the Fifth Circuit confirmed this interpretation when it held that marine superintendents who worked on location at client sites met the second element of the Administrative Exemption because they performed *non-manual* work as their primary duty. 605 Fed. App'x 349, 354 (5th Cir. 2015). The fact that their work took place on location or outside a traditional office setting was immaterial because their main duty was non-manual. *Id*. Here, the testimony at trial established that Plaintiffs' primary duty was non-manual work. Troy Sutherlin, who hired and supervised Plaintiffs, confirmed that Plaintiffs' primary duty was obtaining data and annotating their observations and analysis, which he agreed was non-manual. Francis Neill, who was CEO of EVO, confirmed that Plaintiffs' primary duty was obtaining useful video and interpreting it for the customer, which he explained was non-manual. Arthur White, who is EVO's U.S. Land Operations manager, supervised some of the Plaintiffs and regularly performs the job of a Field Engineer, confirmed that Plaintiffs' job was to obtain usable video of the well, analyze the data, make annotations, and interface with customers about their findings, which was all non-manual. Finally, each Plaintiff also confirmed that their primary duty was non-manual, describing that the video analysis was their primary function.

Plaintiffs testified at length about the "manual" tasks they performed, including rigging, lifting, and cleaning the camera tool, along with climbing stairs and various other ordinary activities.[2] However, each of them ultimately admitted that those tasks were not the purpose for which they were hired, but instead were only part of the process and directly related to the primary

---

[2] Plaintiffs' testimony about lifting the tool was eventually debunked by evidence that the tool was placed on stands during the rig up and rig down process and that all weight was borne by the wireline winch. Moreover, Plaintiffs went to great lengths describing hot and cold temperatures during some jobs, and the fact that they wore protective gear. However, this is simply white noise and has no bearing on whether a job is manual or non-manual.

responsibility of getting usable video to analyze and diagnose issues affecting the client's well.

Moreover, Plaintiffs and White testified that these "manual" tasks took only a fraction of Field

Engineers' time, with Plaintiffs estimating the tasks taking only a couple of hours and White

estimating them to be only 15 to 20 percent of the total job. The FLSA regulations provide that:

> Work that is "directly and closely related" to the performance of exempt work is
> also considered exempt work. The phrase "directly and closely related" means tasks
> that are related to exempt duties and that contribute to or facilitate performance of
> exempt work. ***Thus, "directly and closely related" work may include physical
> tasks and menial tasks*** that arise out of exempt duties, and the routine work without
> which the exempt employee's exempt work cannot be performed properly.[3]

29 C.F.R. § 541.701(a)(emphasis added).  In other words, performing manual tasks that are directly

and closely related to an employee's exempt work does not alter their exempt status. *See Renfro v.*

*Indiana Michigan Power Co.*, 370 F.3d 512, 517 (6th Cir. 2004)("Performing some manual work

does not automatically remove an employee from exempt status . . . ."). Accordingly, despite

Plaintiffs' heavy emphasis on the "manual" tasks they performed, the evidence at trial clearly

established that those tasks did not take a significant amount of time and were not their primary

duty, but instead were "directly and closely" related to their primary duty, which was exempt work.

Plaintiffs' primary duty was also directly related to the "management or general business

operations" of EVO's customers. Under the regulations, an employee meets this element of the

exemption when his primary duty relates to the running or servicing of the employer's or its

customer's business. 29 C.F.R. § 541.201(a)-(c). The Department of Labor provides a *non-*

*exclusive* list of areas that relate to the "management or general business operations," element

stating:

> Work directly related to management or general business operations includes, but
> is not limited to, work in functional areas such as tax; finance; accounting;
> budgeting; auditing; insurance; quality control; purchasing; procurement;

---

[3] The regulations provide examples of "directly and closely related" work, including one where an exempt employee
might have to set up machines in connection with his/her overall duties. 29 C.F.R. § 541.701(b)(4).

advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. *Id.* at (b).

At trial, Plaintiffs tried to establish that their jobs did not fall into any of the areas listed in the FLSA regulations and attempted to claim they were "production" employees who merely produced a "product" and, therefore, did not qualify for the exemption. But Plaintiffs miss the mark. First, the areas listed in the regulations are only examples that are *sufficient*, but not *necessary,* to meet the exemption. Indeed, 29 C.F.R. §541.201(b) ends with the phrase "and similar activities"—clearly signifying that the list of qualifying areas is not exclusive. In any event, Plaintiffs' work involved quality control, safety, loss mitigation and other functions related to EVO's client's business operations. Plaintiffs testified that EVO's customers called when there was a problem that needed to be identified and solved. White and Neill both explained that Plaintiffs' work allowed EVO's customers to identify and correct well performance issues and even avoid total well loss, which could cost customers millions of dollars. Lee's emails to customers and the job logs Plaintiffs prepared also perfectly demonstrated the scope of the analytical services Plaintiffs provided and how that work was tied to the customers' overall quality control and loss mitigation efforts.

Moreover, 29 C.F.R. §541.201(c) states that "employees acting as advisers or consultants to their employer's clients or customers . . . may be exempt." Plaintiffs were quintessential consultants, providing expert analysis and support to EVO's customers— who were in the business of drilling wells and capturing hydrocarbons, on matters that impacted the very center of the customers' operations. In this respect, Plaintiffs are analogous to the employees in *Carbaugh v. Unisoft Int'l Inc.,* No. H-10-0670, 2011 WL 5553724 (S.D. Tex., Nov. 5, 2011), who traveled to customer sites to install, test, and set up operations for the customers. As the employer's sole

representative on site, these employees interfaced with customers and developed plans to assist the customer with its needs. *Id.* at \*22. The District Court relied on 29 C.F.R. § 541.201(c) and concluded that the employees were exempt because they acted as consultants to the employer's customers.

Contrary to Plaintiffs' argument, they were not merely "production" line employees.[4] In *Zannikos*, the Fifth Circuit specifically rejected the argument Plaintiffs try to make in this case. There, the plaintiffs claimed that "employees who produce the precise service offered to customers by their employer are engaged in production [.]" *Zannikos*, 605 F. App'x at 353. The Fifth Circuit stated that "plaintiffs' interpretation would render the administrative exemption largely meaningless" because "[m]any—perhaps most—employees whose primary duties directly relate to the management of customers perform the precise services offered by the employers." *Id.* In other words, performing the service at the heart of an employer's business does not make an employee a "production" worker. Here, Plaintiffs were consultants, performing important work and providing meaningful guidance and recommendations that helped EVO's customers solve major problems affecting their operations. Accordingly, they each satisfy the second prong of the Administrative Exemption.

**2.    Plaintiffs Exercised Discretion and Independent Judgment Regarding Significant Matters**

Under the third prong of the Administrative Exemption, the "exercise of discretion and independent judgment" involves the employee's "comparison and [] evaluation of possible courses

---

[4] Plaintiffs may rely on *Dewan v. M-I, L.L.C.*, 858 F.3d 331 (5th Cir. 2017) in support of their "production" argument. However, Plaintiffs' reliance is misplaced. First, because it was a review of the district court granting summary judgment in favor of defendants, the Fifth Circuit did not provide a definite statement regarding plaintiffs' duties, but merely held there were fact issues regarding whether plaintiffs' services were directly related to the general business operations of their employer's customers, among other things. Ultimately, a jury in this very Court found that the plaintiffs in Dewan qualified for the Administrative Exemption based on some of the same regulations described in this Closing Brief.

of conduct, and acting or making a decision after the various possibilities have been considered."

29 C.F.R. § 541.202(a). While "[t]he exercise of discretion and independent judgment implies that

the employee has authority to make an independent choice, *free from immediate direction or*

*supervision*," it does not require that the employee's decisions have "a finality that goes with

unlimited authority and complete absence of review." 29 C.F.R. § 541.202(c)(emphasis added).

Indeed, an employee can still exercise discretion and independent judgment even when his

decisions "consist of recommendations" that may be revised or reversed. *Id.* The DOL regulations

offer a list of non-exclusive factors that may reflect "discretion and independent judgment,"

including whether the employee: (1) carries out major assignments in conducting the operations

of the business; (2) performs work that affects the business operations to a substantial degree, even

if the employee's assignments are related to operations for a particular segment in the business;

(3) provides consultation or expert advice; (4) represents the company in handling complaints; (5)

has the ability to implement operating practices; and (6) is involved in planning long or short term

business objectives.  29 C.F.R. § 541.201(b). If an employee meets at least two of the factors, the

employee is typically found to be exercising discretion and independent judgment. *See Bondy v.*

*City of Dallas,* 77 Fed. App'x 731, 732 (5th Cir. 2003).

The evidence at trial established that Plaintiffs operated with significant autonomy and

independence on matters of significance. As Neill testified, their job was to "project manage the

EV job from beginning to end in its entirety." Before a job even started, Plaintiffs communicated

with customers to collect information regarding the scope of the work, made decisions about the

proper camera tool for the project and made recommendations about fluid issues that would impact

the success of the video analysis they ultimately performed. Once on site, as EVO's sole

representatives, Plaintiffs were responsible for confirming the scope of work with the customer

and then for executing every phase of the project to the customers' satisfaction.  At the outset of nearly every project, Plaintiffs usually had to adjust their plan of action because every well was unique and conditions on the ground were often different from what had been described to them during the planning phase. Plaintiffs had to analyze the wellbore fluid situation because having clear fluid was paramount to capturing a high quality video. Plaintiffs were responsible for explaining the significance of clear fluid to the customer and, if the fluid clarity was poor, recommended options to the customer including fresh water, diesel, xylene or other known fluids that they knew would work correctly in that particular wellbore environment. Plaintiffs were responsible for addressing any issues that developed with the camera tool operations, ensuring that any issues were resolved so that they could properly execute the project for the client.  Plaintiffs were also responsible for representing EVO during safety meetings on each project, with authority to stop work when a safety issue arose.

Plaintiffs were at their best when they were analyzing the well data. Sutherlin testified that Plaintiffs directed every critical operation affecting the camera tool and the video feed needed to analyze the well, from instructing the wireline operators how to deploy and position the tool in order to get the best video for analysis and diagnosis, to determining the telemetry and light settings to optimize video communications and image quality. Most importantly, Plaintiffs analyzed and interpreted unique and complex well environments in order to find answers and provide them to EVO's customers. As the evidence at trial showed, the images of the wells were not straightforward and required Plaintiffs to use their experience and judgment to correctly interpret what they were seeing. Plaintiffs also used their judgment and discretion to identify unexpected issues in the well and brought those to the customers' attention. Plaintiffs' job was not finished once they completed the video analysis. As Lee's numerous emails and White's testimony

demonstrated, Plaintiffs typically completed post-job analyses, sometimes finding new areas of interest, and communicated with clients regarding those findings. White also explained that Plaintiffs were required to and did follow up with EVO's customers regarding their findings, even traveling to the client's business office to discuss the video analysis and answer questions. Further, White explained that there were no manuals or well established techniques for how Field Engineers analyzed videos, diagnosed the problem, and advised the customer regarding the problem—which was the most important aspect of their job.[5] Thus, even if Plaintiffs did not make ultimate completion decisions regarding the customers' wells, there is no question that they acted independently and used discretion and independent judgment to carry out the work they performed as Field Engineers for EVO's customers.

Additionally, Plaintiffs testified that their worked involved matters that were important and significant to EVO's customers. Hobbs agreed that Field Engineers' work was important, particularly to engineers (or "office people") who were responsible for running and overseeing the customers' operations. Sutherlin explained that Plaintiffs' work was important because it assisted EVO's customers in making well-informed decisions. White testified that customers call EVO when there are problems affecting the operation of their wells, which could lead to total well loss or production deficiencies that cost millions of dollars to the customer. Moreover, Neill and Sutherlin testified that a Texas Court had already examined the services EVO's Field Engineers provide and found that they performed specialized data acquisition services and were not merely

---

[5] Plaintiffs spent a significant amount of time trying to establish that they performed well established techniques on the job, but they focused exclusively on what White described as the "basic" steps (such as connecting tools and walking up stairs), rather than the critical analysis and interpretation they performed, which was their primary duty and exempt work that did not involve well established techniques. Moreover, to the extent there were guidelines or established procedures related to Plaintiffs' work this does not preclude exemption. *See* 29 C.F.R. § 541.705 ("The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption . . . .").

taking pictures or recording videos like a wedding photographer. In light of these facts and the other evidence presented at trial, Plaintiffs clearly satisfy the third prong of the Administrative Exemption.

**3.     Lee's and Arroyo's "Trainee" Status**

Lee and Arroyo also try to avoid their exempt status by claiming they were "trainees" for a portion of the time at issue. This is misplaced as well. The regulations state that the white collar exemptions do not apply to employee trainees "who are ***not*** actually performing the duties of an executive, administrative, professional, outside sales of computer employee." 29 C.F.R. § 541.705 (emphasis added). Here, the evidence established that Lee and Arroyo were actually performing the duties of a Field Engineer throughout their respective training periods. Lee confirmed that he went out on location and performed the job of Field Engineer during his six-month training period. Although Arroyo initially claimed that he only started performing the job of a Field Engineer during the last five months of his employment at EVO, numerous job tickets throughout 2014 and 2015 confirm that he was the Field Engineer on site for various projects.[6] White further testified that while an individual is training they are in the "driver's seat" and performing the duties of a Field Engineer. Therefore, Lee's and Arroyo's "training" periods do not alter their exemption status.

**B.     Highly Compensated Exemption**

Employees who earn at least $100,000 per year and who perform at least one of the exempt duties of a white collar exemption are exempt from the minimum wage and overtime requirements

---

[6] Arroyo admitted he was not performing the job as expected, stating "I never really felt comfortable doing this job. Like I—to me the full engineer you would be able to take the calls and talk to the engineers and the company men and be able to plan a job from beginning to end and I felt like I never got to that point." Sutherlin testified that he terminated Arroyo because he was not performing the standards expected of a Field Engineer. To the extent Arroyo was ineffective at the job, that is no basis to conclude he was non-exempt. *See Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 600 (E.D. Cal. 2008)(Court stating "an employee who is supposed to be engaged in [an exempt activity] during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption." quoting *Ramirez v. Yosemite Water Co*., 9781 P.2d 2 (1999)).

---

of the FLSA. 29 C.F.R. §541.601(a), (c). Thus, an employee would qualify for the Highly Compensated Exemption if he earned at least $100,000 annually and also performs office or non-manual work related to an employer's business or that of its customers. The regulations explain that such employees are exempt from overtime because a high level of compensation is a strong indication of the employee's exempt status *and no detailed duties analysis is necessary*. 29 C.F.R. § 541.601(c)(emphasis added). It is stipulated that Hobbs earned (1) $163,392.02 in 2014; (2) $164,750.00 in 2015; (3) $110,576.50 in 2016; (4) $125,140.33 in 2017; and (5) $85,392.19 (*pro rata*).[7] Likewise, it is stipulated that Jones earned $122,932.07 in 2014 (his only year of recovery) and Lee earned $100,839.46 in 2015. As described above, Plaintiffs satisfy at least one element of the administrative exemption. Therefore, Hobbs, Jones, and Lee qualify for the highly compensated exemption for the years identified above.[8]

## C.   Plaintiffs are Exempt Under the Outside Sales Exemption

To qualify for the outside sales exemption, an employee must have a primary duty[9] that involves "making sales" or "obtaining orders or contracts for services or for the use of facilities for which consideration will be paid by the client or customer," and must be "customarily and regularly engaged away from the employer's place or places of business" in performing such sales duties. 29 C.F.R. § 541.500.

The evidence showed that Plaintiffs qualify for the  outside sales exemption. First, each Plaintiff testified that they regularly promoted EVO's business both on and off the job site, away from EVO's office. Indeed, their sales duties were inseparable from their other responsibilities

---

[7] An employee who does not work a full year can still qualify for the Highly Compensated Exemption if he received a *pro rata* portion of $100,000 based on the number of weeks actually worked. 29 C.F.R. §541.601(b)(3).

[8] An employee does not have to qualify for the Highly Compensated Exemption for the entire recovery window. The exemption would apply for the years in which he earned over $100,000.00. *See McCoy v. N. Slope Borough*, No. 3:13-CV-00064-SLG, 2013 WL 4510780, at *13 (D. Alaska Aug. 26, 2013).

[9] "The term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. §541.700(a).

---

because if they did not have sales, they did not have jobs. When they were not providing operational support services to customers, Plaintiffs were traveling away from EVO's office to meet with customers or to submit promotional information related to EVO's services. Hobbs testified that he drove around looking for swivels in the air, while Arroyo explained that he was constantly making sales calls. White affirmed that sales were an important responsibility for Field Engineers. Accordingly, Plaintiffs each qualify for the Outside Sales Exemption. *See Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 633 (7th Cir. 2010) (Court finding that to the extent plaintiff's "primary duty was not outside sales, the combination of her outside sales and administrative work exempts her from the FLSA's overtime requirements.").

**D.     Plaintiffs Cannot Establish a *Prima Facie* Case of an FLSA Violation**

To prevail on their FLSA claims, Plaintiffs must prove by a preponderance of the evidence: (1) there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) the employee engaged in activities within the coverage of the FLSA; (3) the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due. *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014).

**1.     Plaintiffs Cannot Prove They Worked Overtime for Specific Workweeks**

"An employee who brings suit for unpaid overtime compensation bears the burden of proving, with definite and certain evidence, that he performed work for which he was not properly compensated." *Reeves v. Intern'l Tel. & Tel. Co.*, 616 F.2d 1342, 1351 (5th Cir. 1980), cert. denied, 449 U.S. 1077 (1981), implicitly overruling on other grounds recognized by *Heidtman v. Cnty of El Paso,* 171 F.3d 1038, 1042 n.4 (5th Cir. 1999). An employee meets his burden if he "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Harvill v. Westward Commc'ns L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005)(quoting *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680,687-88 (1946)). If the employee meets his

initial burden, then the employer has the burden to produce evidence regarding the amount of work actually performed or evidence to "negate the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (quoting *Anderson*, 328 U.S 680). However, a plaintiff's overtime claim must fail if there are "no factual allegations at all to substantiate [his] claim" and if the plaintiff presents "no evidence of the amount or extent of hours [he] worked without compensation [.]" *Id.*

As evidence of alleged overtime hours, Plaintiffs offered their time sheets and summaries of work hours that were purportedly based on their time sheets. However, Plaintiffs' "evidence" was completely unreliable and did not come close to meeting their burden of proving the amount and extent of any alleged overtime hours. First, Plaintiffs admitted that their time sheets did not track their actual work hours but instead generally only showed "12" hours for field days and "8" hours for shop days. Thus, the time sheets offered no reasonable account of Plaintiffs' work hours. Indeed, Plaintiffs testified that time spent out in the field varied—sometimes less than 12 hours and sometimes more than 12 hours. None of the Plaintiffs could describe what an "average" week looked like for them, let alone testify about specific overtime during any given week.[10] Additionally, White testified that Plaintiffs were not required to be at the shop if they did not have any work to do, and were able to go home or run errands, among other personal activities.

---

[10] Arroyo's overtime claim is even more problematic because there was a period of time during his recovery window when he admitted he was working on a wireline truck that belong to Greg Linville, an EVO consultant. Arroyo admits he never told anyone at EVO about this work but still recorded his time as if he was working for EVO. Neill confirmed this during his testimony, stating that he never authorized Arroyo to work on Linville's truck and actually became aware of this for the first time during trial. Accordingly, to the extent Arroyo was working any overtime during this period, the evidence affirmatively established that EVO was not aware of this and he should not be awarded overtime compensation for this period because it would clearly include work that had nothing at all to do with EVO's business. *See Krohn v. David Powers Homes, Inc.*, No. CIV A H-07-3885, 2009 WL 1883989, at *4 (S.D. Tex. June 30, 2009)(Court finding that even if Plaintiff established she worked over 40 hours in a week, she still failed to show Defendants were aware of it).

Further, the time summaries upon which Plaintiffs relied were fraught with problems and were entirely unreliable. Plaintiffs admit that they did not create or provide input regarding the time summaries and only reviewed them after their lawyer created them. Even though Plaintiffs originally testified that the summaries were accurate, Defendants affirmatively demonstrated that the summaries were all chock-full of errors—including in their alleged work hours standby time, holiday time, vacation time, time spent driving home, time spent sleeping or engaging in other personal activities, multiple entries for one day, entries claiming 48 hours in a single work day, entries describing multiple consecutive weeks of 168-hour workweeks (effectively claiming numerous back-to-back 24 hour work days with no sleep or break at all), and countless mathmatical errors. Remarkably, Plaintiffs shrugged these issues away, suggesting that the Court could simply disregard them and subtract them from Plaintiffs' work hours. But this is nonsensical because Plaintiffs ultimately bear the burden of proving that they had overtime hours during the specific weeks at issue.  By the conclusion of trial, Plaintiffs were ultimately unable to confirm the accuracy of their evidence regarding their alleged overtime hours, even after some of them claimed to have reviewed them a second time. Indeed, Hobbs identified 25 errors that he purportedly found on his own (between his direct examination and cross examination), but even then missed other errors that Defendants established during trial. Thus, while Plaintiffs claim to have worked long hours on certain days, they completely failed to meet their burden of proving that they had overtime hours in any "specific workweek." *See Krohn v. David Powers Homes, Inc.*, No. CIV A H-07-3885, 2009 WL 1883989, at \*2 (S.D. Tex. June 30, 2009)(Court finding that Plaintiff's testimony that she worked approximately 54.3 hours a week was not "probative evidence that Plaintiff worked more than forty hours in any specific workweek."). Accordingly, even if the Court were to find that Plaintiffs were non-exempt employees (which the evidence shows they were not), they

have not met their burden of proving overtime hours during any specific workweek at issue and, therefore, their claims ultimately fail.

**2.      Plaintiffs Failed to Show Copeman Qualified as an Employer Under the FLSA**

During trial, each of the Plaintiffs described very limited, if any, interaction with Copeman. All admitted they had no interaction with him regarding their (1) hiring or firing; (2) compensation; (3) work schedules; and (4) personnel files. Moreover, Sutherlin testified he was Plaintiffs' supervisor and that Copeman was not involved in any day-to-day operations that impacted Plaintiffs' work. Jones even described Sutherlin as "the boss." Moreover, Copeman's deposition excerpts confirmed his lack of involvement with Plaintiffs as well. Plaintiffs' only evidence of Copeman's status as an alleged employer included general policies and other documents Copeman signed in his capacity as CFO.  But the Fifth Circuit has confirmed that this is simply not enough. *See Krohn*, 2009 WL 1883989, at \*5 (finding that the owner/operator of the company did not qualify as an employer because "he did not generally act for [the company] *in relation* to Plaintiff." (emphasis in the original)). To meet the "economic realities" test for employer status, an employee must show that: (1) the individual possessed the power to hire and fire the employee; (2) the individual independently exercised supervision and control over the employee's work schedule or other conditions of employment; (3) the individual determined the individual's compensation; and (4) the individual maintained employment records for the employee. *Williams v. Henagan,* 595 F.3d 610, 620 (5th Cir. 2010); *see also Donovan v. Grim Hotel Co.*, 747 F.2d 966 (5th Cir. 1984); *see also Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012). Because Plaintiffs only showed Copeman's general authority as CFO and did not offer any evidence that he acted as an employer in relation to each of them specifically, their claims against him fail and he should be dismissed.

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

By: */s/ Marlene C. Williams*
    Marlene C. Williams
    Texas State Bar No. 24001872
    Federal ID: 22824
    1001 Fannin, Suite 3700
    Houston, TX 77002
    Telephone: (713) 470-6100
    Facsimile: (713) 654-1301
    MarleneWilliams@eversheds-sutherland.com

**ATTORNEY-IN-CHARGE FOR DEFENDANTS**

**OF COUNSEL:**
Michael J. Woodson
Eversheds Sutherland (US), LLP
1001 Fannin, Suite 3700
Houston, TX 77002
Telephone: (713) 470-6100
Fax: (713) 654-1301
MichaelWoodson@eversheds-sutherland.com