United States District Court
Southern District of Texas

**ENTERED**

August 29, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEROD HOBBS, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-00770 |
| | § | |
| EVO INCORPORATED, *et al*, | § | |
| | § | |
| Defendants. | § | |

## **ORDER**

The Parties and their counsel appeared before this Court for a bench trial for the determination of their claims in the above-styled and numbered case. Each side presented evidence during trial, produced briefing, and made their respective arguments as to the effects of the evidence, and the Court hereby issues its findings of fact and conclusions of law. The Court will first give a brief background and set out the facts to which the Parties have agreed. Next the Court will recount in detail the relevant testimony and other evidence adduced at trial. Finally, the Court sets out its findings of fact and conclusions of law.

### **I.    Background Facts**

Plaintiffs Jerod Hobbs ("Hobbs"), Ronald Lee ("Lee"), Arlen Jones ("Jones"), and Jordan Arroyo ("Arroyo") were field engineers that worked for E.V. Incorporated (hereinafter "EVO").[1] Plaintiffs filed suit against EVO, Maurice McBride ("McBride"),[2] Francis Neill ("Neill"), and Sam Copeman ("Copeman"). The Plaintiffs brought this action seeking unpaid overtime and liquidated damages under the Fair Labor Standards Act ("FLSA"), claiming they worked more than 8-hour

---

[1] Plaintiffs Hobbs, Lee, Jones, and Arroyo will frequently be collectively referred to as "Plaintiffs."

[2] The Court granted a directed verdict at trial as to McBride, and as such he has been dismissed as an individual Defendant.

days/40-hour weeks during the course of their employment with EVO and were not paid overtime wages as required by the FLSA.

Defendants concede that Plaintiffs were not paid overtime, but they differ with Plaintiffs on whether Plaintiffs are owed overtime and differ significantly on the frequency that overtime pay might be due, if indeed any is due. They also concede that there were occasions when the Plaintiffs worked in excess of 40-hour weeks, but they claim that Plaintiffs were not entitled to overtime wages because they are exempt from the requirements of the FLSA under the administrative, highly compensated, and outside sales exemptions.

### A. Agreed Findings of Fact Submitted by the Parties

#### i. EVO's Business

EVO is a company that provides downhole video camera services for the oil and gas industry. (Doc. No. 98 "Joint Pretrial Order" ¶ 6.1). EVO has specialized and proprietary camera technology which allows it to assist its customers in reviewing well conditions, such as to identify, diagnose, or photograph conditions that interrupt operations at a wellsite. EVO is an enterprise in commerce within the meaning of 29 U.S.C. § 203(s)(1) and § 203(r). (*Id.* ¶ 6.2–6.3). EVO has and had an annual gross volume of sales made or business done of not less than $500,000. (*Id.* ¶ 2). EVO is a domestic for-profit corporation incorporated under the laws of the State of Texas with its principal place of business in Harris County, Texas. (*Id.* ¶ 6.4). The other individual defendants—Copeman and Neill—are citizens of the United Kingdom. (*Id.* ¶ 6.6–6.8). The Parties agreed that EVO and Neill are employers under the FLSA. (*Id.* ¶ 6.9–6.10).

The two individual Defendants were executives at EVO or one of its affiliates. (McBride acted as interim CEO of EVO from June or July 2015 until April 2016).[3] (*Id.* ¶ 6.11). Copeman

---

[3] McBride was granted a directed verdict in his favor at trial.

served as Director of EVO, Corporate Officer of EVO, and acted as President of EVO. (*Id.* ¶ 6.12). The time frame in which Copeman held these positions is discussed in more detail below. Since the Parties conceded Neill was an employer as that term is defined in the FLSA and since the Court directed a verdict on that issue in favor of McBride at trial, it will concentrate any discussions of individual liability on Copeman.

> ii.    *Plaintiff's Employment with EVO*

EVO employed the four Plaintiffs as field engineers. (*Id.* ¶ 6.18). Hobbs, Lee, Jones, and Arroyo were EVO's employees within the meaning of the FLSA. (*Id.* ¶ 6.13). The Plaintiffs worked for EVO for the following periods of time:

- Hobbs: September 1, 2011 until August 6, 2018

- Lee: September 4, 2014 until May 4, 2018

- Jones: April 2011 through October 5, 2014

- Arroyo: January 1, 2013 to January 26, 2016

(*Id.* ¶ 6.14–6.17). As field engineers, the Plaintiffs would travel to customers' wellsite locations where they would obtain downhole video and provide EVO's customers with a thumb drive containing the downhole video, the job log, and individual pictures as requested by the customer that the field engineer collected throughout the job. (*Id.* ¶ 6.20–6.22). The job logs and summaries were prepared on location by the field engineers, as well as real-time annotations of the downhole video for the customers. (*Id.* ¶ 6. 33). At the job site, field engineers interfaced with wireline operators, engineers, and company representatives—often called the "company man." (*Id.* ¶ 6.32).

During the course of their employment with EVO, the Parties agree that Plaintiffs were typically the sole EVO representative at a customer's site. (*Id.* ¶ 6.31). As field engineers, the Plaintiffs did not handle employee grievances or complaints (*id.* ¶ 6.24), did not discipline other

employees (*id.* ¶ 6.25), and did not and could not set or adjust the rate of pay of other employees (*id.* ¶ 6.23).

During their employment, the Plaintiffs were located in different states. Hobbs, whose original title was "West Virginia Base Manager," was initially located in West Virginia and then was transferred to Oklahoma as a field engineer. (*Id.* ¶ 6.26–6.27). Lee was based in Colorado. (*Id.* ¶ 6.30). Jones was based in Oklahoma. (*Id.* ¶ 6.28). Arroyo was based in California. (*Id.* ¶ 6.29).

As field engineers, Plaintiffs earned a salary of at least $455.00 per week. (*Id.* ¶ 6.19).

The agreed recovery period for Hobbs is March 24, 2014 to August 6, 2018. (*Id.* ¶ 6.36). Hobbs' compensation during those time periods was as follows:

- 2014: $163,392.01

- 2015: $164,750.00

- 2016: $110,576.50

- 2017: $125,140.33

- 2018: $85,393.19

(*Id.* ¶ 6.37). The agreed recovery period for Lee is September 2, 2014 to May 4, 2018. (*Id.* ¶ 6.38). Lee's compensation during the time period was as follows:

- 2014: $24,783.25

- 2015: $100,839.46

- 2016: $72,541.51

- 2017: $75,150.80

- 2018: $29,972.33

(*Id.* ¶ 6.39). The agreed recovery period for Jones is March 24, 2014 to October 5, 2014. (*Id.* ¶ 6.42). Jones' compensation during the time period was as follows:

4

- $122,932.07

(*Id.* ¶ 6.43). The agreed recovery period for Arroyo is March 24, 2014 to January 26, 2016. (*Id.* ¶ 6.40). Arroyo's compensation during the time period was as follows:

- 2014: $58,752.00

- 2015: $60,530.88

- 2016: $9,875.00

(*Id.* ¶ 6.41). During their employment with EVO, Defendants treated Plaintiffs as exempt employees for overtime purposes. (*Id.* ¶ 6.44).

## B. The Testimony and Other Evidence Adduced at Trial

### i. *General Background Information about EVO*

EVO is a wholly owned subsidiary of E.V. Holdings. (EVO Ex. 93 at 14:17–15:7) ("E.V. Holdings owns . . . E.V. Offshore Limited in the U.K. and E.V. Offshore owns E.V., Inc. [EVO].") The related companies in this corporate family include E.V. Holdings, E.V. Finco, and E.V. Offshore, but these entities are not at issue in this case. Although some of the chief executives at issue in this case were on the board of E.V. Holdings, such as Copeman and McBride, in those positions they nonetheless maintained executive responsibilities over EVO.

This case involves a large number of non-party individuals who are repeatedly mentioned in the testimony and exhibits. Accordingly, the Court will briefly address the names and titles of the most frequently mentioned persons:

- Francis Neill: Former CEO of EVO.

- Maurice McBride: Acted as interim CEO of EVO from June or July 2015 until April 2016.

- Fraser Louden ("Louden"): The replacement CEO of EVO after Neill left.

- Sam Copeman: CFO of EVO.

5

- Jonathan Thursby ("Thursby"): Developed the downhole video technology and vision for the company. He served on the executive board as Chief Technical Officer ("CTO").

- Troy Sutherlin: VP US Lands of EVO. In this capacity, he directly or indirectly supervised Plaintiffs.

- Arthur White ("White"): Rockies District Manager / Technical Manager. In this capacity, he reported to Sutherlin and supervised Lee. He later replaced Sutherlin in 2016 as the VP US Lands.

- Gregg Linville ("Linville"): California Manager (Consultant). He supervised and trained Arroyo.

- Monica Flores ("Flores"): Another Financial Controller for EVO.

Additionally, EVO produced an organizational of its company in Plaintiffs' Exhibit 5, which the Court now describes in relevant part. The executive management sector was made up of a first tier—the CEO (Neill, McBride, and later Louden)—then a tier consisting of the CFO (Copeman), Chief Technical Officer (Thursby), VP Marketing, Engineering and Manufacturing Manager, President Americas, Europe/Asia Region Manager, and "MENA" Asia Region Manager. Under President Americas was a third tier, consisting of the "GOM" Manager, VP US Land (Sutherlin), and VP Canada. (Plaintiffs' Ex. 5 at 1).[4] Copeman directly supervised three Financial Controllers (Trudi O'Brien, Alan Hardingham, and Monica Flores) and an IT Support Engineer. (*Id.* at 2).

Within the North American region, the three regions (GOM, US Land, and Canada) each had similar divisions with slight differences in nomenclature. In particular, the regions had supervisors over the field engineers and a separate sales engineer or sales manager. (*Id.* at 7–9). The US Land chain of command at one point in time appeared as follows:

---

[4] The acronyms "MENA" and "GOM" were listed in the exhibits before the Court without any definition. Their meaning, however, is not necessary to decide the dispositive issues in this matter.



(*Id.* at 9). As the chart shows, Sutherlin oversaw the entire US region. There were three specifically designated salespersons, one in Houston, one in Dallas, and one in the Rockies District. Several field engineers reported directly to Sutherlin, including Hobbs. Others in the Rockies District, such as Ron Lee, reported to White, who in turn reported to Sutherlin. The California prong consisted only of Arroyo reporting to Linville. (*Id.*). Jones is not listed in any organizational charts in evidence but was directly supervised by Sutherlin.

ii.   *Copeman's Role as a Purported Employer*

The Court now turns to the relevant factual findings regarding Copeman's role with EVO as it relates to the Plaintiffs. Some of the more relevant evidence includes the following:

- The Parties provided designated excepts from Copeman's deposition in lieu of live testimony. In those designations, Copeman testified to the following facts:

    o   Copeman held positions as both the director of EV Holdings and as the Chief Financial Officer ("CFO") of E.V. Holdings and CFO of E.V. Finco. (Plaintiff's Ex. 94 at 9:3–15; 7:15–18).

    o   Copeman's responsibilities as CFO of E.V. Holdings were as follows: "There were several key facets to that job. One was to be a part of the -- or to help formulate the business plan for the company and produce annual budgets. Then during the year to then be able to understand and explain variances against that budget in our actual performance, to ensure we had sufficient financing to deliver that business plan, to directly supervise the financial controllers of the business, and that's all I can remember at this point." (*Id.* at 9:16–25).

- o In the capacity of CFO of E.V. Holdings, Copeman worked as the direct supervisor of the financial controller of EVO. (*Id.* at 11:15–19).

- o In 2015, Copeman held the position of president of EVO. During that time, his responsibilities were still of those of CFO of E.V. Holdings, which were to supervise the financial controller of EVO. (*Id.* at 19:2–12; 15:1–20).

- o As the president of EVO, Copeman lacked power to hire or fire employees or to set wages, did not have the responsibility of maintaining employment records or supervising employee schedules, and did not determine rate and method of payment for employees. (*Id.* at 19:13–21:17; 38:6–25).

- o Copeman was not involved in the decision whether to classify field engineers as exempt or non-exempt employees under the FLSA. (*Id.* at 67:18–21).

- On February 26, 2016, Copeman signed letters to both Hobbs and Lee indicating that due to an economic downturn, their terms of employment and salaries would be changed. The letter indicated that it was an offer to continue employment under the new terms, which would be withdrawn if not accepted within three days. (Plaintiff's Exs. 52, 73).

- The Statement of Employee Particulars, which detailed the terms of employment for Lee, was signed by Copeman in March 2016 on behalf of the company. (Plaintiff's Ex. 53).[5]

- In Defendant's Supplemental Objections and Answers to Plaintiffs' First Set of Interrogatories, EVO was asked to identify "each person involved in job classifications as exempt or non-exempt and/or decisions to pay or not pay overtime wages to these employees." (Plaintiffs' Ex. 3, ROG 1). In response, EVO averred that "Troy Sutherlin made recommendations regarding job classification, compensation, and salaries . . . Sam Copeman participated in some discussions regarding EVO employees' salaries and compensation. Francis Neill approved certain salary and compensation recommendations made by Sutherlin and/or Copeman." (*Id.*).

- At trial, Louden confirmed his response to a prior interrogatory in which he stated that the decision regarding exempt v. non-exempt determinations was made between McBride and Copeman.

- Neill testified that Copeman was the CFO, in which position he produced letters of employment, put employees on payroll, and maintained employment records.

- Sutherlin testified to the following regarding Copeman:

---

[5] The Court compares this employment agreement with that of Arlen Jones, dated June 26, 2011, which indicated on its signature line that Francis Neill would sign on behalf of the company. (Plaintiffs' Ex. 29).

- o Sutherlin testified that he explained to Copeman how the pay schemes had worked at ExPro, his previous employer, but that the structure for pay was already set by the time Sutherlin joined EVO.

- o He testified that EVO had an executive compensation committee, consisting of Copeman, Neill, and Thursby, amongst others. He averred that the committee met once annually after conducting appraisals and the committee would adjust rates of pay accordingly.

- o He testified that Copeman wrote the employee manual for EVO.

- o Sutherlin made recommendations regarding salaries and bonuses to the executive committee, which included Copeman.

- o Sutherlin also testified that Copeman was not involved in the day-to-day operations of EVO.

- Plaintiffs were required to fill out self-appraisal forms to evaluate their performance prior to an appraisal meeting. revisions to the appraisal form were reviewed and approved by "SC." (EVO Ex. 51).

- Plaintiffs testified that they did not know Copeman but did receive communications from him during their employment with EVO:

  - o During the trial, Hobbs testified that he did not interact with Copeman but had a couple of letters signed by him. Hobbs testified that he never met Copeman but when his salary was cut, Copeman was the one who signed the letter as EVO's corporate secretary notifying him of the change.

  - o Lee testified that he did not know Copeman. He also testified to receiving a letter telling him his pay would be cut from Copeman, but said he had only ever seen the name on EVO organizational charts but did not interact with him. Lee also explained that he had no personal interactions with Copeman and did not know what the extent of Copeman's involvement in his employment conditions were.

  - o Jones testified that he did not know Copeman. He acknowledged that in his employment agreement, all notices were supposed to be sent to Copeman.

  - o Arroyo testified that he only knew of Copeman through the documents he had signed relating to Arroyo. He did not recall interacting with Copeman.

### iii.   Plaintiff's Employment with EVO

As the Court already noted, Plaintiffs were employed by EVO as field engineers. Their primary duty in that role is a point of significant contention between the Parties. Plaintiffs were not trained or licensed professional engineers but learned their skills either through on-the-job training or employer-provided training courses. The Court will describe what the evidence submitted to the Court shows about their employment with EVO: their qualifications, job descriptions, and the day-to-day activities of their job.

### a.   Initial Hires and Plaintiffs' Employment Backgrounds

Plaintiffs arrived at EVO at different times and with different professional and educational backgrounds. Hobbs was hired to work at EVO in 2011, and he had previously worked in a similar capacity at ExPro, a competitor of EVO's. Hobbs initially held the title of "West Virginia Regional Manager" when he was first hired at EVO in September 2011. (Plaintiffs' Ex. 71). He testified that he had no particular managerial responsibilities in that position, but rather worked as a field engineer and tried to find new jobs whenever he was not in the field. Hobbs' title was formally changed in 2016 to "Senior Field Engineer," but he testified that he moved to Oklahoma in 2013 and began working only as a field engineer at that time.

Lee was employed as a field engineer by EVO and was based in Colorado under the direct supervision of White. He testified that in his previous positions, he was "a missile facility specialist" with the United States Air Force.

Jones was hired in 2011 and had been previously employed by DHV International where he started running similar video equipment back in 1989. His initial employment agreement as of June 2011 shows that he was hired as "Lead Field Engineer." (Plaintiffs Ex. 29).

Arroyo was also employed as a field engineer by EVO. His immediate supervisor was Greg Linville, the California Regional Manager. As was stated in his job description, which Linville and

Arroyo agreed to as of June 11, 2013, Arroyo was a "trainee field engineer" and his purpose of the job was to "operate EV Downhole video equipment, on location, in a professional, competent and safe manner in order to satisfy the clients [sic] requirements." (Plaintiffs' Ex. 14 at 2). His job description listed the following relevant components: "to successfully operate and to have sufficient working knowledge of EV Downhole Video (Electrical) equipment that you are required to use"; "to pack and load out equipment in a correct and efficient manner"; establish good rapport with onsite client engineers"; "assist in the base duties, making reports, packing kits etc. when required"; "to remain alert to onsite opportunities for providing other group services"; and "to be available for work at short notice when required." (*Id.*).

Arroyo had approximately one year of "oilfield-related" experience prior to beginning his employment as a field engineer as a chemical inventory employee with GT Analytical. (EVO Ex. 15). Arroyo's resume indicates that before then, he was employed as a pusher/hydro-tester/maintenance employee with Brinderson Construction; maintenance at a different construction company; wait staff at a restaurant; and an after-school program coordinator. His educational background consisted of an Associate Degree in Science from Ventura Community College. (*Id.*).

Arroyo testified that his understanding when he was hired to be a field engineer trainee was somewhat different than the other Plaintiffs. He testified that he was hired to assist Greg Linville with a lot of the physical tasks that Linville could not handle since he was a little bit older in age. Arroyo explained that these tasks included carrying the tools, cleaning up the tools, picking up the tools, and the other physical activity involved in the job.

Only Arroyo had an extended job description included in the record. Arroyo's signed job description included the following relevant information:

- "Job Context and Main Activities: (Outline the context in which the job operates and record the types of activity involved in achieving principal accountabilities: [sic] The job holder reports directly to the Operations Manager. The job holder operates EV Down hole [sic] tools on location in a professional, competent and safe manner in order to satisfy the client's requirements." (Plaintiffs' Ex. 14 at 3).
- "Decision making Authority/Level of Supervision Required: Allocated workscope [sic] by Operations Manager. On job discussions based on experience and in accordance with company procedures and policies." (*Id.*).
- "Relationships: (Who are the job holder's most important contacts and for what purpose? Consider both external and lateral contacts, excluding immediate supervisor and subordinates, but including personnel at other locations, if appropriate): Operations Manager - prioritization / allocation of workload." (*Id.*).
- "Job Challenges: (Identify the most complex or demanding aspects of the job) To work independently in remote locations. To be available for work at short notice." (*Id.*).
- "Job Knowledge and Experience: (Indicate only the essential background qualifications, education, skills and aptitudes, specialized training and experience necessary to perform the job competently): N/A." (*Id.*).

Each Plaintiff received notice that they would be paid a salary plus bonus either in their offer letters, employment contract, or both. (Plaintiffs' Exs. 29, 37, 51, 70, 71). While Arroyo was hired as a field engineer trainee, Lee and Jones were hired as field engineers. As noted above, Hobbs initially held a different title, "West Virginia Regional Manager," although he testified that his actual work and pay were those of a field engineer. At one point in his tenure, as is discussed in more detail in Subsection iv, Hobbs received an offer letter and potential employment agreement for the position of "Technical Sales Advisor" in August 2016 from EVO, which he declined.

Sutherlin hired Hobbs and Jones, was their supervisor, was responsible for their schedules, and conducted their job reviews. Sutherlin also hired Arroyo, although Linville was his direct supervisor and set Arroyo's schedule. Sutherlin supervised Linville. Sutherlin made a recommendation to hire Lee and gave him the offer letter after getting approval and a signature from Neill. Lee reported to White, who in turn reported to Sutherlin. (Plaintiffs' Ex. 5).

Plaintiffs maintained time sheets throughout the course of their employment with EVO. The time sheet format was provided by EVO and was updated in 2016 when Sutherlin was replaced

12

by White as the VP US Lands. The 2016 version provided additional work categories or locations, such as job site, shop, sales, etc. Plaintiffs testified that throughout their employment, they kept their records as they had been instructed to do by their supervisors. During the years when Sutherlin was VP US Lands, Plaintiffs were instructed to write the same number of hours on their time sheets regardless of whether they worked more or less than those hours on a given day. The instructions were to record twelve hours for days on a job site and eight hours for days in the shop.

     b.  <u>Plaintiffs' Primary Duties</u>

Witnesses defined the primary duties of a field engineer in a variety of ways. Hobbs testified that his job at EVO was to travel to location and "to record video and downhole pictures of problems in a well so that the customer can make an informed decision about moving forward." Lee testified that he considered his primary duty to be obtaining a clear video and providing the data via thumb drive to the client.

Jones averred that his job responsibilities as a field engineer were to go out onto location, rig up cameras, if downhole, retrieve data for the customer, give the data to the customer and allow him to make a judgment on what he needed to do economically for his well.

After listening to Hobbs' description of his primary job duties at trial, Lee generally agreed but distinguished his day-to-day responsibilities in several ways. First, while he was primarily hired to be a field engineer, Lee testified that it was made clear to him when he was hired that he was a good fit to help out in the shop with repairs to the equipment. He described that it was EVO's expectation that when he was not in the field doing jobs, he would be in the shop either cleaning, repairing or redressing tools, or preparing for the next job. He also testified that there were no particular specialized job requirements or educational backgrounds necessary for the job. Similarly, Arroyo testified that his understanding of his primary job duties was that he was a helper on site to do manual labor.

13

Louden explained that the primary duty of the job, that is, the part that the field engineers were being paid for, was their expertise in explaining to customers what the video showed in the wellbore. Neill testified that the field engineers were paid more than he was as the CEO, but said that he agreed with that because they were doing a "critical job" and were the face of EVO. He explained that if the company did not get a picture, they would be metaphorically in the penalty box. The customer may pay them but probably would not. As he described it, the ability of the field engineer was to get a good quality image and keep the customer happy. That is why he believed the company paid them that amount.

    c.  <u>Description of the Field Engineer Process on a Client Wellsite</u>

Field engineers remained on call around the clock, and when a client called with a job, their supervisor would send them to the wellsite or client site in order to deploy downhole video cameras. Plaintiffs testified that when they got the call, regardless of the time of day, they would pack up their equipment and immediately drive to the wellsite, sometimes upwards of 12 hours one-way to get to a job site. For example, Hobbs was based in Oklahoma, but testified that for any job site within the continental U.S., he would drive to the site upon receiving the call. He testified that he had jobs everywhere from North Dakota to south Texas, west Texas, Pennsylvania, New York, Ohio, Alaska, Louisiana, Mississippi, Arkansas, and Kansas. As such, a field engineer would be required to keep his tools ready to go. When a client called with a job, the supervisor would send the field engineer to the job site and generally would send information about where to go and what the job was.

Once at the job site, the field engineer would work under the overall direction of the company man, and in tandem with a wireline crew that operated a third-party rigging truck (known as a "wireline truck"). If present, the field engineer would also consult with the client's petroleum engineer. EVO was hired for these projects usually upon discovery of a problem at a wellsite, so

field engineers would arrive as quickly as possible in order to send the cameras down the well to get a visual depiction of the potential problems downhole. Before doing that, the field engineers would need to test the fluid in the well in order to determine the downhole visibility. They usually tested fluid visibility by filing a water bottle with the well fluid and dropping a coin in it to see if the coin was visible in the bottle. Hobbs testified that even if the fluid was not clear enough to see the coin, he could not make changes to the fluid conditions in the well; instead, he could only recommend that the company man make alterations, and then would have to run the job regardless of whether the company man took his advice. All witnesses agreed that fluid visibility was essential to obtaining good footage but agreed that a field engineer could not overrule a company man's decision if he opted not to make changes to fluid conditions.

The make-up of the camera and ancillary equipment that would be inserted into the well could vary in length from 3 feet to 12 feet depending on what equipment was necessary for the particular job, and could weigh upwards of 50 pounds. The field engineer was tasked with assembling the necessary components for the particular job and then hooking them up to the wireline truck's equipment. That truck would have a wire spool attached to the wench, which would allow the camera to be lowered and remain connected. At that point, the field engineer would instruct the operator the speed at which to "stab" the camera into the well, that is, the speed at which the operator should lower the camera into the well in order for the camera to obtain footage as well as when to start and stop.

While the camera was lowered, the field engineers observed what was visible from the cameras on a screen from a different location at the wellsite, during which they would annotate the video. Hobbs testified that during a job, the camera data would be displayed on a computer screen in the wireline truck, and that usually he was not the only one watching it. He testified that usually the company man would watch with him, along with the wireline operator. Other viewers,

depending on the job could include a fishing[6] hand or swivel operator, and even sometimes the client company's petroleum engineer. Hobbs averred that the company man and engineer would often want to watch because they would make the decision, based on what they saw, as to what their next move on the well would be to resume production.

Lee explained that of the people watching the screen, he was probably the least qualified to make any recommendations as to what the company could do based on what showed up on the screen. Lee testified that the company man would watch the screen just as intently as he did to see if he could recognize a problem. Lee said he liked that because the company men were really the subject matter experts of the well. Lee considered himself to be the camera operator while the crew members on the rig were the experts at identifying what was in the well. He described that he was trained to use the equipment as a tool to support their efforts. He said that he was an expert at operating that camera, but that was a means to an end for that company to figure out what's going on. He said that he would provide annotations and his best guess about what he saw, but that he deferred to the company man's impression of the video results, even if he disagreed.

Jones testified that when he looked at the video with the company men and other individuals in the wireline truck, he would make sure they saw the point of interest and they would discuss amongst themselves what the image showed and what their next step in the process would be to remediate the problem. Jones testified that he was just a tool in their toolbox, essentially, as he would show up, run the video camera down the well, show them what was down well, and then sit down with the company people so they could make a decision. In testimony, White said that the field engineers were supposed to describe to the best of their ability what they thought they saw. If it was obviously clear what was on screen, White testified that field engineers should tell

---

[6] In his testimony, Hobbs explained that a "fish" is something in the well that is not supposed to be there.

the company man what was shown. Plaintiffs also testified that at times they would call their supervisor or send footage for a second opinion.

White testified that the field engineers follow guidelines provided by EVO for operating those tools and were also provided with a maintenance schedule and operations manual. EVO contends that while these manuals help the field engineers know how to conduct the operation, it does not teach them what to look for in the video footage, how to recognize what they are seeing in real time, and how to analyze what they see to provide possible diagnoses to the clients.

Plaintiffs explained that they used vague language to describe what they saw down well. For example, Jones testified that he never used definitive language to describe what he thought he saw on camera. Sutherlin testified that they used indefinite language, such as a "possible hole," because there was no way to write on a job ticket what the problem was with 100 percent certainty. Plaintiffs also testified that they could only explain what they currently saw, but did not know from the footage what had previously occurred in the well. Hobbs testified that if he made an observation or diagnosis of what he saw in the well that the company man or company engineer disagreed with, he had no authority to overrule their determination of what to do with the well. That said, Hobbs testified that typically the people in the wireline truck watching the video agreed about what the camera feed showed.

After completing the videography portion of the job and rigging down, the field engineers also completed "tickets" or "work orders" summarizing the job for both the client and EVO's records. The field engineer drafted the ticket, got the client or company man's signature and then the ticket was usually sent to the Financial Controller or Sutherlin. (*See, e.g.*, EVO Ex. 99-B). Finally, they would check whether any damage was done to the tools, pack up, and return to the shop. Sutherlin testified that typically follow-up with the client after completion of the job was typically done by either himself or a salesman.

The exhibits before the Court involving Lee show that he sometimes submitted additional write-ups and reports to his supervisor regarding his findings during jobs that other Plaintiffs did not produce (or that were not in the record). (*See, e.g.*, EVO Ex. 100-C). In other instances, Lee did send follow up emails to the client after jobs inquiring if there were questions about the camera runs and offering explanations of what they saw and why some of the readings may have issues. (*See, e.g.*, EVO Ex. 100-M).

Sutherlin testified that different downhole factors could influence the relative difficulty of a particular job. For example, things like pressure, depth, and temperature, as well as whether it was a vertical or horizontal well, could affect the difficulty of a job.

### d.  Aspects of the Field Engineer Job Involving Manual Labor

Several witnesses testified that at least some portions of Plaintiffs' work involved physical exertion and manual labor. Hobbs averred that the portion of the job involving rigging up the camera and rigging it down was manual work and that he had lots of stained fire retardant clothes from that process. He explained at the trial that during a job, he would wear fire retardant, flame resistant clothing, a hard hat, safety glasses, and gloves. He explained that the contents of the well would often get on him when taking the camera mechanism out of the well, and that part of the job required cleaning the camera and other attachments before he could pack them up. Hobbs further testified that the field engineer was the one responsible for attaching the camera mechanism to the wireline set-up, regardless of whether that meant climbing up an elevated rig or not, and regardless of the weather conditions or time of day. He also explained that the cleaning process could take up to an hour because of the type of tools involved and because the centralizer component—which consisted of small metal pieces splayed outwards to keep the camera at the center of the well tube—accumulates a lot of debris. Lee, Jones, and Arroyo all testified that this part of the job involved manual labor. Arroyo specifically testified that when he was at the shop,

18

he was only working on cleaning tools, helping build a wireline truck, cleaning the shop, and doing manual labor.

When the field engineers were not on a job site and returned to their home station, Hobbs testified that they worked from a regional "shop" that consisted of a garage, desk, work bench, and tools for maintenance on the camera and its accessories. The field engineers were also responsible for cleaning the shop, such as taking out trash, sweeping the facility, and cleaning its bathroom.

e. What Fell Outside of a Field Engineer's Job Responsibility

During the course of trial, Plaintiffs testified to several tasks or work activities that were not a part of their job with EVO, which the Court will outline here. Plaintiffs testified:

- As field engineers, they did not have authority to set or adjust rate of pay for other EVO employees;
- At no time did they handle other employees' grievances or complaints;
- They did not handle disciplining other employees;
- When on job sites, they did not tell the company man how to perform future operations on the well based on their findings;
- They did not tell clients how to conduct their general business operations or how they could operate the well more efficiently;
- They did not make and were not qualified to make completion decisions for the customer;
- They did not manage general business operations for EVO;
- They did not administer business affairs for EVO. Rather, Plaintiffs testified that they produced EVO's main service or product, that is, downhole video;
- Their work did not involve management or general business operations in the area of tax;
- Their work was not related to finance, accounting, budgeting, auditing, insurance, quality control, purchasing, procurement, advertising, marketing, research, safety and health, personnel management, human resources, employee benefits, labor relations, public relations, government relations, computer network, Internet and database administration, legal and regulatory compliance, or similar activities;
- While Plaintiffs consider what they did on the job sites to be important, they said it was a routine process used when there was some kind of downhole problem that was standard in the industry;
- During the time period involved in this lawsuit, their primary responsibility was never sales;

- They could not approve expenses,[7] enter into contracts on behalf of, negotiate on behalf of, or sign master service agreements on behalf of the company[8];
- They did not supervise two or more full-time employees;
- They did not have authority to formulate management policies.

In summary, all Plaintiffs were agreed that their goal in the job was to record video and provide that information to the client on a thumb drive. They testified that the work involved repetitive operations with hands, physical skill and energy in running the downhole tools, servicing those tools while they were on job sites and at the shop. Further, Arroyo testified that rather than providing downhole video services and data, his primary duty was helping Linville at job sites by doing the manual labor involved.

When EVO's corporate officers were asked about these job responsibilities or lack thereof, they testified as follows:

Louden testified that Plaintiffs could not adjust or set the rate of pay for other employees, could not hire and fire employees, could not handle employee grievances or complaints, did not run the business for EVO, did not supervise other employees, did not have authority to formulate management policies or create policies for EVO, and could not enter into contracts or negotiate on

---

[7] It appears from the exhibits that Plaintiffs had to request that any expenses they incurred by approved by Sutherlin and one of the Financial Controllers. For example, Jones turned in expenses to Sutherlin and Flores on May 4, 2014 and asked that they expedite the reimbursement as he was at a low balance on his card and might need to book more travel for an upcoming job in Alaska. (EVO Ex. 106).

[8] Some exhibits in the record showed that Plaintiffs had some flexibility in adjusting client project prices. For example, on August 2, 2015, a client sent an email to McKeever, the Sales Engineer in the Rockies District, indicating displeasure at the quality of work received for the price. McKeever forwarded this email to Lee and White. In response, Lee sent an email to White and McKeever explaining why the conditions of the video were the way they were, and explaining that he had made some changes to the client price: "I also knocked off my extra time and footage charges and adjusted the discount to 45% to get us to the quoted price . . . I know we were trying to be competitive with our pricing and I was wanting better results as well so I tried to be fair where I could. The ticket ended up a couple hundred dollars less that [sic] the quote, I figured any deeper discounting should be done after consulting with you." (EVO Ex. 100-E). When asked about the email at trial, Lee testified that the quote for the project was previously set, so he had to manipulate his price to fit with the quote provided to the customer. Hobbs testified to the same at trial, explaining that the jobs had a set price and the field engineer had some flexibility in applying a discount in order to ensure they did not charge the client more than the original quote. White averred that field engineers have the ability to adjust the discount line to help get to the quoted final price, if the engineer knows what the quote is for the job. He explained the field engineer would need to get authority from a supervisor to make major adjustments to the discount price.

behalf of EVO. He also testified that Plaintiffs were not required to have an advanced degree for the position of field engineer. Louden also averred it was outside the scope of the responsibilities and duties of a field engineer to provide the client with a list of alternative completion actions it could take to resolve the problem in the well.

Neill testified that field engineers could not make completion decisions or recommendations to clients, because it was both outside the scope of their job and would create liability for EVO. He explained that their recommendations to clients should be about what was necessary to obtain pictures down well. He also confirmed that field engineers could not set or adjust rates of pay for employees, did not handle employee complaints or grievances, did not discipline employees, hire or fire employees, approve major expenditures, make job offers, make changes to terms of employment, or sign master service agreements on behalf of the company.

White agreed with this testimony at trial. He affirmed that a field engineer's overall purpose is to operate the EVO downhole field equipment onsite in a professional, competent, and safe manner in order to satisfy the client's requirements. He testified that an important part of that job was making sure the company man knew if the fluid would not be clear enough to get a visual from the camera so the company could change fluid conditions if necessary.

> iv.   *Plaintiffs' Involvement in Sales*

During the trial, Hobbs testified that distributing promotional and marketing materials was occasionally part of their job when they were not working on a wellsite. Hobbs described that if they were not on a job, they would go look for swivels in the air, which meant that an oil company was doing remedial work on a well. If they were doing remediation, Hobbs thought they might need to see down well. They would drop off hats, business cards, Troy's business cards, and brochures to those customers in case they wanted to hire EVO. Hobbs averred that during this process, even if he found a swivel in the air and called on the site, he could not take a master

service agreement to the site's company man, negotiate pricing for a job, or enter into binding agreements on behalf of EVO. In his trial testimony, Lee testified that the closest he got to sales was dropping off literature with a fellow employee who showed him some of the places that employees liked to go to drop off literature.

The exhibits in the record also provided more information about Plaintiffs' involvement in marketing or sales efforts. The EVO US Land hierarchy flowchart showed that Sutherlin, as VP of US Lands, oversaw several employees who held specific sales-related titles. (Plaintiffs' Ex. 5 at 9). For example, Colby Smarek was titled "Houston Sales" while Shawn Sims was titled "Dallas Sales." (*Id.*). Within the Rockies District, Chris McKeever is listed as "Sales Engineer." (*Id.*). None of Plaintiffs are listed on the chart under a sales category. Rather, each that appears on the chart is listed under "Field Engineer." Jones is not shown on the chart, but Hobbs, Lee, and Arroyo are. (*Id.*). Hobbs testified that the designated salesmen, Sims, McKeever, and Smarek, did not run downhole tools and operated as designated salesmen.

The time keeping chart provided by EVO for the Plaintiffs to record their hours included a general category "Other" for time spent on workshop duties, sales, management, etc. (*See, e.g.*, Plaintiffs' Ex. 44). That category does not specifically separate out time spent on sales. For Jones and Arroyo, their time records do not specifically identify any time spent on sales, but do include time in each month spent on the "Other" category. (Plaintiffs' Exs. 33, 41, 44). Lee, in contrast, was given a timesheet chart that included a column for "Sales." (Plaintiffs' Exs. 64, 67). He also took notes about each day's activities. These timesheet charts show no time dedicated to sales in 2017 or 2018. (Plaintiffs' Exs. 64, 67).

Unlike the other Plaintiffs, Hobbs' timesheet charts do include some time designated as sales. For example, in 2014, January 5 to 21st are labeled as "Sales in AK," while March 3 to 5th

and March 24 and 25th are labeled as "Sales." (Plaintiffs' Ex. 78). Hobbs' records show the

following time ranges were dedicated to sales:

| 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|
| Jan. 5-21<br>Mar. 3-5, 24-25<br>Apr. 3-13, 21, 29<br>May 19, 24-25, 29-31<br>June 13, 16-18, 26-27, 30<br>July 14-18, 21-25, 28-31<br>Aug. 4-5, 12-14<br>Sept. 1-5, 8-9, 22, 29-30<br>Oct. 9-10, 13-17, 20-24<br>Nov. 3-4 | Jan. 5<br>Feb. 2, 16-19, 23-25<br>Mar. 3, 5-6, 16-20, 23-27, 30-31<br>Apr. 1-3, 13, 17, 20-21<br>June 1-2, 15-19, 22<br>July 9-10, 13, 20-24<br>Aug. 3-7, 17-21, 24-28<br>Sept. 21, 29-30<br>Oct. 1-2, 5-8, 14-16, 19-21, 27<br>Nov. 9-13, 16-17, 23-25, 30<br>Dec. 1-4, 11, 14-18, 21, 23-24 | Jan. 1-2, 4-8, 11-15, 18-22<br>Feb. 1-5, 8-12, 16-19, 22-26, 29<br>Mar. 1-4, 28-31<br>Apr. 1, 4-5, 11-15, 25-29<br>May 2-3, 5-6, 19-20, 25-26<br>June 27, 30<br>July 5-6, 18-19<br>Nov. 10-11 | Feb. 13, 15<br>Apr. 17, 19, 24<br>May 23-25<br>Oct. 26 |

(Plaintiffs' Exs. 78, 81, 84, 87, 90).

Although Arroyo, Jones, and Lee's time sheets do not show sales, their monthly mileage

logs do indicate sales activities. For example, in 2015, Arroyo's monthly mileage logs show

several days in the months of February, March, April, June, July, October, November, and

December in which Arroyo explained some of his logged mileage under the purpose "sales calls."

(EVO Ex. 6). Likewise, Jones had mileage log entries under "sales call" in April, May, June, July,

and August of 2014. (EVO Exs. 46). Interestingly, in Jones' email signature, he listed his title as

"Sales/Operations." (EVO Ex. 106).

Additionally, the exhibits submitted by Plaintiffs show that on August 12, 2016, Copeman

sent a letter to Hobbs offering him the position of "Technical Sales Advisor" with EVO. (Plaintiffs'

Ex. 75). Plaintiffs' Exhibit 76 consists of the accompanying employment agreement between

Hobbs and EVO as of August 22, 2016. It indicated that in addition to salary, Hobbs would be

eligible to receive a discretionary sales commission. (Plaintiffs' Ex. 76 ¶ 4(b)). It described that

"[d]uring his employment, [Hobbs] shall serve as Technical Sales Advisor and report directly to

Jeff Whitaker, Sales and Marketing Manager, Western Hemisphere, or such person(s) as are appointed to replace your Line Manager from time-to-time by the Company." (*Id.* ¶ 2). Hobbs testified during trial, however, that he understood that job would likely be in Midland and that he preferred his location, so he did not accept the offered position.

Each ticket or work order for a project included various information required for the project, such as the well name and number, expected job date, services offered, EV engineer, specifications for the camera and well, and, more relevantly, the salesperson associated with the job. (*See, e.g.*, EVO Ex. 99-A). EVO submitted a collection of job information sheets submitted by each Plaintiff. (EVO Exs. 99, 100, 101, 103). A sampling of the exhibits shows the following:

| Exhibit | Well Name & Number | Sales Person | EV Engineer |
|---|---|---|---|
| EVO Ex. 99-D | Lange 2-5 WH | Colby Smarek | Jerod Hobbs |
| EVO Ex. 100-I | UL 7-27 H5 WD | Chris McKeever | Ron Lee |
| EVO Ex. 101-A | VRRU LAI1-L/W 206 | Gregg Linville | Jordon Arroyo |
| EVO Ex. 101-G | 753NU-34 C string | Gregg Linville | Jordon Arroyo |
| EVO Ex. 103 | Akator #1H | Troy Sutherlin | Arlen Jones |

For the remainder of the work logs in the record, of which the above chart is a sampling, no Plaintiff was listed as a salesperson. Rather, the remaining logs show a separate dedicated salesperson assigned to each job.

Sutherlin testified that from 2014 onward, Plaintiffs did not have sales as a primary responsibility, and that their role in that area was only handing out literature, his business card, and company hats.

The trial testimony from EVO's corporate officers also indicated their perception of whether the Plaintiffs operated in sales. Regarding Hobbs, Jones, and Lee, Louden testified that when they were not in the field at client jobs, they had to work on sales in order to have more jobs. They had to do sales in between being field engineers because if not they would not have any other work to perform, but it was not the primary duty. If there was a field operation happening they

would go and do the field operation, but when they were not doing field operations they were responsible for helping with sales.

When asked about Plaintiffs individually, Louden testified as follows. Regarding Hobbs, Louden testified that when he was first hired in West Virginia, Hobbs' primary duty was sales because without sales there would be no projects for him to perform; however, he testified that when Hobbs moved to Oklahoma in 2013, his primary duty was that of a field engineer but that sales was still an important component. Louden testified that Jones' principal duty was to be a field engineer and that his principal duty was not sales. Louden testified that he did not contend that Arroyo was exempt under the sales exemption.

Neill testified that from 2014 forward, none of the field engineers had sales as their primary duty, as their primary duty was to get video. White, who supervised the field engineers from 2016 forward, testified that field engineers assisted with sales from time to time, but that it was not a full-time responsibility or their primary duty.

### v.   *Plaintiffs' Time as Trainees*

Hobbs and Jones went through training with EVO, but because their employment began in 2011 and the relevant time period for Jones for this case is only in 2014, their training periods are not at issue with regard to FLSA exemption.

White testified that Lee spent about five or six months of training. Sutherlin testified on the other hand that Arroyo was still not done with training or "broken out" of the role of field engineer trainee by the end of his employment with EVO. The training involved understanding the technology, obtaining downhole knowledge, and learning how to interpret what the field engineers saw on the screen. The training consisted of on-the-job training under either a senior field engineer, Sutherlin, or White. Since Hobbs' training occurred during his first year, 2011, that falls outside of the time period at issue for him in this case.

25

In his testimony, Lee recalled approximately six months of training during which time he would not go to rig jobs on his own. The record shows that Lee was initially hired on July 17, 2014. (Plaintiffs' Exs. 50, 51). He testified that his training started with time in the shop to learn what the tools were and how to run them, and then would go into the field with White to be trained on location, such as learning how to do the job, who people on the work site were, oil field nomenclature, and similar lessons—basically an introduction to the oilfield experience.

Arroyo was a trainee when he began work with EVO, and the evidence in the record and testimony suggests that he never really progressed from a trainee to an independent field engineer during his time of employment. In his testimony, Arroyo stated that it was never established how long he was a trainee because about 90 percent of the jobs he did were with his supervisor Linville. As stated above, Sutherlin testified that Arroyo never "broke out" to be a full-fledged field engineer, although near the end of his employment he did do a few jobs on his own. He explained that Arroyo was hired to be Linville's helper, but that the hope had been for Arroyo to eventually work independently, but that never happened. Arroyo averred at trial that although it hurt his pride, he never felt comfortable doing the job alone and could not discuss the jobs with company men on the site in the way that his supervisor Linville did. Louden testified that Arroyo was a trainee for roughly two years and Lee was a trainee for approximately six months. White also added that Arroyo did do a few jobs on his own.

Arroyo testified that he up until the last four or five months of employment with EVO, he worked as a trainee and did not handle a project as the only field engineer on site until that point. He also testified that for many jobs, Linville would list himself as the salesperson and Arroyo as the EV engineer even when Linville operated as the actual engineer onsite. When shown a series of job tickets with his name as the engineer at trial, Arroyo averred that even though he was listed

as the engineer on the job tickets, he never did any of those jobs by himself. He also testified that he never received any formal notice from EVO that he had been promoted from trainee status.

> vi.   *EVO's Attempts at FLSA Compliance*

Neill, when asked about his understanding of the FLSA, testified that he was the compensation and benefits manager at an oil company prior to joining E.V. Holdings, and therefore had a high-level understanding of exempt versus non-exempt statuses and the requirements for them.[9] He testified that Sutherlin recommended the compensation packages and that he (Neill) approved them based on Sutherlin's recommendations and Neill's own knowledge of the position and similar compensation packages. For example, he testified that the bonus scheme they initially implemented when founding EVO was the same one he had used or seen at three other companies, and that to him it made sense to structure the bonuses based on revenue generated by the field engineer per day.

Neill also explained that at the beginning of EVO, they were hiring camera operators from a competitor who had been paid as exempt employees and would not come to the company unless they were treated as exempt. Neill explained that Sutherlin's recommendation was based on ten years of their prior employment as exempt employees, and that the company did not see it as an issue to continue that. He also explained that he was aware other companies employed camera engineers as exempt and paid them a salary and bonus. Plaintiffs herein were for the most part paid a salary and a bonus depending on the job. Those bonuses were not insignificant. Neill testified that he did not look at the FLSA provisions himself, that he did not seek counsel from an attorney familiar with the FLSA, and did not contact a human resources specialist in making the exemption decision. Neill testified that to his knowledge, EVO did not rely on written or administrative

---

[9] Neill testified that at the previous employer, he was responsible for overall compensation packages, salaries, pensions, bonus schemes, and relocations for about 3,000 employees.

regulations, orders, rulings, approvals, interpretations, practices or enforcement policies of the Wage and Hour Division of the Department of Labor in forming its exemption policies.

On the other hand, Sutherlin testified that when EVO was being formed—a process in which he was involved—he understood that the framework for employee pay was already set, although he negotiated his salary and made recommendations for the day bonus that would be paid to field engineers. He also testified that he was not familiar with the FLSA until this lawsuit. He further explained that he operated under a framework given to him by the human resources person, Copeman, that detailed the structure for pay and hiring.

Louden, when asked at trial what steps EVO took to ensure FLSA compliance, testified that the decisions were made prior to his arrival and he was not sure what materials the company relied on when making the decision.

## III.   Findings of Fact and Conclusions of Law

### A.   Introduction

As an initial matter, Defendants argue that Sam Copeman does not qualify as an employer under the definitions set forth in the FLSA and thus cannot be held liable for any potential violations. Further, Defendants have pleaded as affirmative defenses that they were not obligated to pay Plaintiffs overtime because they fell into the administrative, highly compensated, and outside sales exemptions of the FLSA. In FLSA classification cases, the employer bears the burden of proving an overtime-pay exemption applies. *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002). The Court therefore lays out the statutory and regulatory framework for each of these exemptions before addressing what statute of limitations applies to the instant case under the provisions of the FLSA.

### B.  General Findings of Fact

Before turning to specific areas of factual and legal contention, the Court makes the following general findings of fact:

1.  Plaintiffs worked from:

    A.  Hobbs: September 1, 2011 to August 6, 2018

    B.  Lee: September 4, 2014 to May 4, 2018

    C.  Jones: April 2011 to October 5, 2014

    D.  Arroyo: January 1, 2013 to January 26, 2016

2.  Plaintiffs earned at least $455 per week.

3.  No accurate hourly or uniform time records were kept concerning Plaintiffs' work during their respective periods of employment at EVO.

4.  No Plaintiff was paid overtime during the relevant time periods. During the relevant time periods each Plaintiff on occasion worked in excess of 40 hours per week. Since the nature of the services provided by EVO were primarily to aid a driller whose operation had encountered problems, Plaintiffs, when on call, would have to respond on short notice and at all times of day or night. Once on the drill site, their actual work schedule would be controlled by the company man.

### B.  Applicability of the FLSA

Under the Fair Labor Standard Act ("FLSA"), employers must pay their employees overtime wages if employees work more than 40 hours a week. *See* 29 U.S.C. § 207(a) (requiring employers to compensate covered employees "at a rate not less than one and one-half times the [employee's] regular rate for hours worked in excess of 40 hours per week). The overtime provisions do not apply, however, to employees exempted by Section 213. *See* 29 U.S.C. § 213 ("The provisions of section [] . . . 207 of this title shall not apply with respect to-- (1) any employee

employed in a bona fide executive, administrative, or professional capacity . . . . or in the capacity of outside salesman . . . ."). To determine whether the Section 213 exemptions apply, courts turn to the DOL regulations interpreting the FLSA for guidance. *Vela v. City of Houston*, 276 F.3d 659, 667 (5th Cir. 2001). "The [Department of Labor] is authorized to promulgate rules interpreting and clarifying the FLSA's administrative and professional exemption." *Clark v. Centene Co. of Tex., L.P.*, 656 F. App'x 688, 690 (5th Cir. 2016) (per curiam). The Fifth Circuit has repeatedly deferred to these administrative regulations in cases involving these overtime exemptions. *See Vela*, 276 F.3d at 667 ("This court must defer to these DOL regulations if (as all parties impliedly concede) they are 'based on a permissible construction of the statute.'") (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

After reviewing the evidence and testimony presented, the Court makes the following findings of fact:

1. EVO is an enterprise as that term is defined in U.S.C. § 203 engaged in interstate commerce with annual gross sales over $500,000 and is in all other ways subject to the FLSA as an employer.

2. Neill is also an employer under the FLSA.

Accordingly, the Court also makes the following conclusion of law: Both EVO and Neill qualify as employers under the FLSA and can be held liable for any overtime pay due to Plaintiffs.

*C. Individuals as Employers Under the FLSA*

Under the FLSA, an employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Within the Fifth Circuit courts rely on the economic reality test when determining a party's status as an employer under the FLSA. *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012); *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014). Under the economic reality test, the Court evaluates "whether the alleged

employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Gray*, 673 F.3d at 355. Nevertheless, a party need not establish each element in every case. *Id.* at 357. "The dominant theme in the case law is that those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies." *Martin v. Spring Break '83 Prods., LLC,* 688 F.3d 247, 251 (5th Cir. 2012) (citation and internal quotation marks omitted).

Further, "[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (per curiam), *modifying* 861 F.2d 450 (5th Cir. 1988). In joint employer contexts, each employer must meet the economic reality test. *Gray*, 673 F.3d at 355.

Here, the Parties agree that Defendants EVO and Neill were employers under the FLSA, but Defendants dispute whether Copeman was an employer and thus whether he can be individually liable. The Court has laid out in great detail what factual assertions have been made regarding Copeman's role with EVO and now makes the following findings of fact:

1. As CFO of EVO and a key player in the formation of the company, Copeman participated in deciding how to structure field engineers' salaries and field bonuses.

2. Copeman was a member of the executive compensation committee, which adjusted employee pay and bonuses annually based on EVO's profits and employee appraisals.

3. Copeman signed letters and contracts regarding employment terms for Plaintiffs and other EVO employees, including letters informing employees of offers of employment, changes to terms of employment, or termination. Copeman maintained the employment records.

31

4.  While Copeman denied that he had the right to hire or fire individuals, for at least two Plaintiffs in this case, he sent them a letter cutting their compensation and, if they did not accept these cuts, telling them they were terminated.

5.  Copeman wrote the employee manual that governed EVO employees.

The Court accordingly makes the following conclusions of law: Copeman, as CFO of E.V. Holdings, in conjunction with Francis Neill, had authority to hire and fire, to update the terms and conditions of employment of EVO employees, maintained or supervised the maintenance of employee records, informed employees when the terms of their employment contracts were changed, compiled termination records for employees at the behest of the company's lawyers, and determined (in conjunction with the board) how annual revenue and expenditures would impact field bonuses and salaries. Accordingly, the Court finds that after looking at the economic realities test, Copeman qualifies as an employer under the FLSA and thus can be held individually liable.

EVO, Neill, and Copeman were employers as that term is defined in the FLSA and as such had a duty to pay overtime to Plaintiffs for those weeks in which they worked more than 40 hours. *See* 29 U.S.C. § 203(d).

### D.  FLSA's Two-Year Statute of Limitations for Non-Willful Violations/ Good Faith Violations

"FLSA claims are subject to a two-year statute of limitations for ordinary violations and a three-year period for willful violations." *Zannikos*, 605 F. App'x at 360 (citing 29 U.S.C. § 255(a)); *see also Singer v. City of Waco, Tex.*, 324 F.3d 813, 821 (5th Cir. 2003). The plaintiff bears the burden of demonstrating willfulness. *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990). "Mere knowledge of the FLSA and its potential applicability does not suffice, nor does conduct that is merely negligent or unreasonable. *Id.* (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132-33 (1988); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 127-28 (1985);

*Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990)). The Supreme Court has

explained an employer's FLSA violation is only willful if it "knew or showed reckless disregard

for the matter of whether its conduct was prohibited by the statute . . . ." *McLaughlin*, 486 U.S. at

133. The Fifth Circuit has further described the importance of this precedent as follows:

> An employer who "act[s] without a reasonable basis for believing that it was complying
> with the [FLSA]" is merely negligent. [*McLaughlin*, 486 U.S.] at 134-35, 108 S.Ct. 1677.
> So too is an employer who fails to seek legal advice regarding its payment practices. *See
> id.; Mireles*, 899 F.2d at 1416. Willfulness has been found when the evidence demonstrated
> that an employer actually knew that its pay structure violated the FLSA or ignored
> complaints that were brought to its attention. *See Ikossi-Anastasiou v. Bd. of Supervisors
> of La. State Univ.*, 579 F.3d 546, 553 n.24 (5th Cir. 2009).

*Zannikos*, 605 F. App'x at 360. Thus, an employer "is not acting willfully even if he fails to seek

legal advice on his payment method or acted unreasonably in violating FLSA." *Villegas*, 2008 WL

5137321, at *26 (citing *Mireles*, 899 F.2d at 1416).

A separate but similar standard applies to the question of whether the employer acted in

good faith in order to determine whether the Court may deny liquidated damages. The FLSA

provides that liquidated damages be awarded for FLSA violations in an amount equal to the actual

damages, 29 U.S.C. § 216(b), but a court may in its discretion refuse to award these liquidated

damages "if the employer demonstrates good faith and reasonable grounds for believing it was not

in violation." 29 U.S.C. § 260. "Whereas the burden is on the plaintiffs to show willfulness,

[Defendants] bear[] the 'substantial burden' of proving the reasonableness of its conduct." *Dacar

v. Saybolt, L.P.*, 914 F.3d 917, 931 (5th Cir. 2018) (quoting *Ransom v. M. Patel Enters., Inc.*, 734

F.3d 377, 387 n.16 (5th Cir. 2013)).

After reviewing the relevant evidence and testimony, the Court makes the following

findings of fact:

1.  EVO and the individual employer Defendants thought Plaintiffs were exempt
    employees. They structured their pay, bonuses, and benefit packages to make sure they

were highly compensated so that they were not subject to overtime payments. In some instances their field engineers insisted on being treated in this fashion. They also based their decision on the fact that they had monitored how other similar oilfield service companies compensated their field service employees. There is no credible evidence that their failure to pay overtime was willful, and the Plaintiffs did not prevail on their burden of proof. None of Defendants knew or showed reckless disregard of their obligation to pay overtime wages to Plaintiffs.

2. Moreover, the preponderance of the evidence all points to Defendants' belief and desire to comply with the law and the Court finds their efforts to comply (combined with no evidence of willfulness or reckless conduct) are sufficient to demonstrate EVO's and the other Defendants' good faith in believing they were not violating the law.

3. This case was filed on March 24, 2016. Unless there is a willful violation, the statute of limitations on an FLSA claim is two years. Applying that time limit to Plaintiffs' employment terms results in the following periods for which damages can be sought:

    A. Hobbs: March 24, 2014 to August 6, 2018

    B. Lee: September 4, 2014 to May 4, 2018

    C. Jones: March 24, 2014 to October 5, 2014

    D. Arroyo: March 24, 2014 to January 26, 2016

Since the Court has found that Defendants acted in good faith and attempted to pay wages in compliance with the FLSA, Plaintiffs' FLSA claims are bound by a two-year statute of limitations. The Court therefore draws the following conclusions of law: The statute of limitations for FLSA claims is two years unless Plaintiff proves willfulness. Plaintiffs have not proven willfulness. This case was filed on March 24, 2016. Therefore the critical period in question is March 24, 2014 through the end of each Plaintiffs' employment. Additionally, the preponderance of evidence

before the Court showed that Defendants acted in good faith and had reasonable grounds, based on leaderships' prior experience and observations of similarly situated jobs in the oil industry, to structure Plaintiffs' compensation as a salaried position. Accordingly the court will not award liquidated damages to Plaintiffs in this case.

### E. Rules Regarding Trainees

Plaintiffs also argue that Lee and Arroyo were trainees for some portion of their employment with EVO. Accordingly, they argue that during the duration of their time as trainees, they are entitled to overtime.

The regulations pursuant to the FLSA state that "[t]he executive, administrative, professional, outside sales and computer employee exemptions do not apply to employees training for employment in an executive, administrative, professional, outside sales or computer employee capacity who are not actually performing the duties of an executive, administrative, professional, outside sales or computer employee." 29 C.F.R. § 541.705.

Based on the testimony and evidence adduced at trial, the Court makes the following findings of fact:

1. During the relevant time period, Arroyo was a trainee from March 24, 2014 to July 26, 2015.

2. During the relevant time period, Lee was a trainee from September 4, 2014 to March 4, 2015.

3. Hobbs and Jones were not trainees at any point during the relevant time period.

For the times when Lee and Arroyo were employed as trainees, the law clearly mandates overtime compensation. The Court draws the following conclusions of law: Exemptions to the FLSA do not apply to trainees. Lee is entitled to overtime for the first six months of his EVO tenure regardless of the application of exemptions. Arroyo was a trainee for the last six months of

his tenure and as such is owed overtime for the above dates as the exemptions do not apply to trainees. Accordingly, Arroyo is owed overtime pay for March 24, 2014 to July 26, 2015. Lee is owed overtime pay as a trainee for September 4, 2014 to March 4, 2015.

### F.  Administrative Exemption

"For the administrative exemption to apply, the employee must be one (1) who is '[c]ompensated on a salary or fee basis at a rate of not less than $455 per week;' (2) '[w]hose primary duty is the performance of office or non-manual work directly related to the management and general business operations of the employer or the employer's customers;' and (3) '[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.'" *Dewan*, 858 F.3d at 334 (quoting 29 C.F.R. § 541.200). The administrative exemption has been fleshed out through examples in the regulations and caselaw.

The Fifth Circuit, in addressing when the administrative exemption applies, has described the test for an employee's "primary duty" as follows:

> Section 541.103 of the interpretations defines "primary duty" with respect to all three exemptions. It provides that, while "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time[,] time alone . . . is not the sole test." Exempt work may be an employee's primary duty even though such work occupies less than half her time "if the other pertinent factors support such a conclusion." Precisely what those factors are depends on upon which exemption is being claimed, but for each the essence of the test is to determine the employee's chief or principal duty . . . [T]he employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time.

*Dalheim v. KDFW-TV*, 918 F.3d 1220, 1227 (5th Cir. 1990) (internal citations omitted). If employees "are closely supervised and earn little more than the nonexempt employees, they generally do not satisfy the primary duty requirement." *Villegas v. Dependable Const. Servs., Inc.*, 4:07-cv-2165, 2008 WL 5137321, at *6 (S.D. Tex. Dec. 8, 2008) (citing 29 C.F.R. § 541.700(c)). The Fifth Circuit has reiterated that the amount of time devoted to particular work duties is not the

sole test and that a finding that the majority of an employee's time "was not spent [on exempt tasks] . . . did not preclude the determination that [his] primary duties consisted of the administration of the general business operations . . . such that the administrative and supervisory duties performed by [the employee] were of principal importance to [the employer], as opposed to those collateral tasks which may have taken more than fifty percent of [his] time." *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 332 (5th Cir. 2000).

The Fifth Circuit has also clarified what "directly related" means:

The Secretary's interpretation, § 541.205(a), defines the "directly related" prong by distinguishing between what it calls "the administrative operations of a business" and "production." Administrative operations include such duties as "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." Work may also be "directly related" if it is of "substantial importance" to the business operations of the enterprise in that it involves "major assignments in conducting the operations of the business, or . . . affects business operations to a substantial degree."

*Id.* at 1230 (internal citations omitted). The term "substantial importance," however, is not meant to signify that a worker's poor performance may cause significant profits or losses. *Id.* at 1231 ("'An employee's job can even be indispensable and still not be of the necessary substantial importance to meet the directly related element.' In assessing whether an employee's work is of substantial importance, it is necessary yet again to look to 'the *nature* of the work, not its ultimate consequence.'") (citing *Clark v. J.M. Benson Co.*, 789 F.2d 282, 287 (4th Cir. 1986).

The Secretary has explained through the regulations that differentiating between administrative operations and production is a key inquiry in determining whether an employee's work is "directly related to the management and general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201(a), (b). "[W]here an employee is primarily involved in producing the product of the company rather than 'servicing' the company, the administrative exemption does not apply." *Villegas*, 2008 WL 5137321, at *7. "Work directly

related to management or general business operations includes, but is not limited to, work in functional areas such as . . . accounting; budgeting; auditing; . . . quality control; purchasing; procurement; . . . safety and health; personnel management; human resources; . . . government relations . . . legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b).

Regarding the exercise of discretion and independent judgment factor, the Fifth Circuit has stated that the administrative exemption "also requires that an employee exercise discretion and independent judgment with respect to matters of significance, which 'involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.'" *Zannikos v. Oil Inspections (USA), Inc.*, 605 F. App'x 349, 354 (5th Cir. 2015) (quoting 29 C.F.R. § 541.202(a)). Although an employee does not need to exercise *final* decision-making authority to meet this standard, exercising discretion requires "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(c), (e); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (holding that an employee may exercise discretion even if his decisions or recommendations are reviewed by senior management and occasionally revised or reversed). Employees may still exercise discretion and independent judgment if they consult manuals or guidelines to perform their work. *Cheatham*, 465 F.3d at 585. The Secretary has laid out a list of ten non-exhaustive factors that courts often consider when making the determination whether an employee exercises the requisite discretion:

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies

and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).

In an FLSA case also involving similar types of employees (mud engineers) on oil sites, the Fifth Circuit reversed the district court's grant of summary judgment for the employing company, despite the fact that summary judgment evidence established that the employees worked closely with company men, continually monitored the quality of drilling fluids and muds, allegedly oversaw other company employees on the drilling site, and allegedly used discretion and independent judgment to implement the drilling plan. *See Dewan*, 858 F.3d at 337. It found that fact issues existed as to the administrative exemption with regard to whether the mud engineers' "work could be classified as office or non-manual work directly related to the general business operations of [the employer's] customers," as plaintiffs had presented enough evidence for a jury to find that some of their work might involve manual labor and production, rather than servicing the business operations. *Id.* at 337-38. The Court further found that plaintiffs' lack of involvement in developing the well plan and their option of deviating from the well plan as needed to meet changing drilling conditions raised a fact issue as to whether they exercised discretion and independent judgment in the course of their work. *Id.* at 338-40. Although the facts differ slightly between the cases and respective plaintiffs and defendant companies, both cases involve the same underlying question of factual determinations regarding the primary duties of the employees and whether they exercised independent judgment and discretion in those roles.

With these considerations in mind, the Court turns to the question whether the Plaintiffs fall within the FLSA's administrative exemption. In this case, the determination requires

consideration of whether Plaintiffs' primary duty was "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" *and* whether their primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance."[10] *See* 29 C.F.R. § 541.200(a). Part of the consideration involves the amount of time that the Plaintiffs spent devoted to particular duties, as well as the significance of those duties. *Id.* (citing *Zannikos*, 605 F. App'x at 352).

The Court makes the following findings of fact regarding the administrative exemption:

1.  Plaintiffs earned at least $455 per week.

2.  Plaintiffs were field engineers, but they were not executives or engineers in the classical sense of a licensed professional engineer either by education or training. Their main duties were to transport the cameras and related equipment to the wellsite, rig-up the equipment, test the wellsite fluid for its visibility characteristics, attach the camera and its related equipment to the equipment provided to EVO by the wireline company, monitor and recommend the speed at which the wireline operator lowered the cameras into the hole, monitor the descent and the filming of the target area, and confer with the company man regarding the result.

3.  While at EVO, at all times pertinent to this case Plaintiffs did not:

    A.  Have authority to set or adjust rates of pay;

    B.  Handle employee grievances;

    C.  Handle disciplinary matters;

    D.  Tell others either within EVO or at a drill site how to perform their duties;

---

[10] Plaintiffs concede that they each meet the salary requirement for the administrative exemption, as the undisputed summary judgment evidence shows that each Plaintiff earned a base salary of no less than $455 per week. Since there is no dispute regarding the first prong of the exemption, the Court does not address it in further.

E. Tell the drilling company or the well owners how to drill or operate their oil well;

F. Make completion or repair decisions at the wellsite;

G. Manage EVO business operations;

H. Administer EVO business affairs;

I. Participate in any tax matters for EVO;

J. Work on finance, accounting, budgeting, auditing, insurance, quality control, purchasing, procurement, advertising, marketing, research, safety and health, personnel management, human resources, employee benefits, labor relations, public relations, government relations, computer networking, internet or database administration, legal or regulatory compliance, or other similar activities while at EVO during the applicable time periods;

K. Approve expenses;

L. Enter or negotiate contracts;

M. Supervise employees; or

N. Formulate management policies.

Accordingly, the Court makes the following conclusions of law: Plaintiffs were not administrative workers under the FLSA, as their primary duty was not one involving the performance of office or non-manual work directly related to the management and general business operations of the employer or the employer's customers and did not require the exercise of independent judgment and discretion.

*G. Highly Compensated Employee Exemption*

"The FLSA provides that '[a]n employee with total compensation of at least $100,000 is deemed . . . exempt if the employee customarily and regularly performs any one or more of the

exempt duties or responsibilities of an executive, administrative or professional employee . . . .'"

*Zannikos*, 605 F. App'x at 359 (quoting 29 C.F.R. § 541.601(a)). To qualify for this exemption, the employee's primary duties must include performing office or non-manual work. § 541.601(d). The employee need not meet all of the requirements of executive, administrative, or professional employees to qualify for this exemption. *See* § 541.601(c). "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." *Id.* The $100,000 threshold can include commissions and bonuses. *See* 29 C.F.R. § 541.601(b)(1). The monetary threshold is satisfied for a year in which the employee works less than the full year if he/she is paid a pro rata portion of the $100,000 based on the period of time he/she worked. *See* 29 C.F.R. § 641.603(b)(3).

The highly compensated employee exemption has its own exception for "blue-collar" workers, as the exemption applies

> only to employees who primary duty includes performing office or non-manual work. Thus, for example, non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, constructions workers, laborers, and other employees who perform work involving repetitive operations with their hands, physical skill and energy are not exempt under this section no matter how highly paid they might be.

29 C.F.R. § 541.601(d). Thus, if an employee who earns at least $100,000 annually also performs office or non-manual work related to an employer's business or that of its customers, the employee qualifies for the highly compensated exemption and is not entitled to overtime pay.

The overarching question before the Court under this exemption is whether Plaintiffs' primary duties included office or non-manual work that would fall under a different exemption. Based on the testimony and facts before it, the Court makes the following findings of fact:

1. Hobbs, Lee, and Jones each at some point in their employment with EVO earned at least $100,000 in a year. According to Neill, field engineers were paid more than EVO's CEO.

2. Plaintiffs' main duties were to transport the cameras and related equipment to the wellsite, rig-up the equipment, test the wellsite fluid for its visibility characteristics, attach the camera and its related equipment to the equipment provided to EVO by the wireline company, monitor and recommend the speed at which the wireline operator lowered the cameras into the hole, monitor the descent and the filming of the target area, and confer with the company man regarding the result.

3. Plaintiffs' work involved repetitive operations with their hands, physical skill, and energy.

Additionally, the Court makes the following conclusion of law:

Plaintiffs Hobbs, Lee, and Jones, although at times earning more than $100,000, did not as their primary job or regularly perform any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee. As such, these Plaintiffs were not exempt from the FLSA as highly compensated employees. 29 C.F.R. § 541.601(a). Plaintiffs' work was more analogous to the examples contemplated in 29 C.F.R. § 541.601(d), which are not exempt regardless of how high their pay grade.

*H. Outside Sales Exemption*

EVO has also pleaded that Plaintiffs were exempted from overtime pay under the outside sales exemption. In particular, it argues:

The evidence showed that Plaintiffs qualify for the outside sales exemption. First, each Plaintiff testified that they regularly promoted EVO's business both on and off the job site, away from EVO's office. Indeed, their sales duties were inseparable from their other responsibilities because if they did not have sales, they did not have jobs. When they were not providing operational support services to customers,

43

Plaintiffs were traveling away from EVO's office to meet with customers or to submit promotional information related to EVO's services. Hobbs testified that he drove around looking for swivels in the air, while Arroyo explained that he was constantly making sales calls. White affirmed that sales were an important responsibility for Field Engineers.

(Doc. No. 112 at 11–12).

Under 29 U.S.C. § 213(a)(1) employees that fall under the outside sales exemption are not owed overtime pay under the FLSA. That exemption defines an "employee employed in the capacity of outside salesman" as one "(1) [w]hose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) [w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a).

For this exemption, the term "primary duty" again means the principal, major or most important duty that the employee performs. Determination of the employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. *See* 29 C.F.R. § 541.700; *discussion supra*. "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a).

In particular, when determining the primary duty within the outside sales exemption, the regulations indicate that

In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as

44

exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500(b).

"Sales" includes "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 C.F.R. § 541.501(b). The word "services" extends the outside sales exemption to employees who sell or take orders for a service, which may be performed for the customer by someone other than the person taking the order. 29 C.F.R. § 541.501(d). The phrase "customarily and regularly" means greater than occasional but less than constant; it includes work normally done every workweek, but does not include isolated or one-time tasks. 29 C.F.R. § 541.701.

An exempt outside salesperson is one who is customarily and regularly engaged "away from the employer's place or places of business" in making such sales. According to the regulations, an individual who qualifies as an outside salesperson may make sales at the customer's place of business, or, if selling door-to-door, at the customer's home. The outside sales exemption does not include persons who make sales by mail, telephone, or the Internet, unless such contact is used merely as an adjunct to personal calls. Any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer may not in any formal sense the owner or tenant of the property. *See* 29 C.F.R. § 541.502.

After reviewing the testimony and evidence adduced at trial, the Court makes the following finding of fact: Plaintiffs were not involved in outside sales in any meaningful fashion either in terms of their actual duties performed or time spent. Stated differently, their primary duty while at

EVO was not making sales or obtaining orders. Their primary duty as described above was to obtain a usable video for the company man to use.

Accordingly, the Court makes the following conclusion of law: Since the Court has found Plaintiffs not to be employed as an outside salesperson as the term is understood under the FLSA, the exemption does not apply and Plaintiffs are owed overtime pay for hours worked in excess of 40 hours per week.

*I.   General Conclusions of Law*

The Court additionally adds the following general conclusions of law:

1. Plaintiffs were not exempt employees as defined by the FLSA and were due overtime pay for hours worked in excess of 40 hours per week.

2. Defendants are liable for overtime wages due to Plaintiffs during their respective relative time periods:

    A. Hobbs: March 24, 2014 to August 6, 2018

    B. Lee: September 4, 2014 to May 4, 2018

    C. Jones: March 24, 2014 to October 5, 2014

    D. Arroyo: March 24, 2014 to January 26, 2016

3. The FLSA provides that liquidated damages can be awarded for an FLSA claim in an amount equal to the actual damages. *Dacar v. Saybolt L.P.*, 914 F.3d 917, 931 (5th Cir. 2018). A court may refuse to award liquidated damages if the employer demonstrates good faith and reasonable grounds for believing it was not in violation. 29 U.S.C. § 260. The defendants bear the burden of proving good faith and reasonableness. Here, the Court finds the Defendants have satisfied their burden. The Court, therefore, will not award liquidated damages.

4.   An award of attorney's fees is mandatory. 29 U.S.C. § 216(b). "The court . . . *shall* in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." *Owens v. Marstek LLC*, 548 F. App'x 966, 973 (5th Cir. 2013) (emphasis added). The Court will award such fees.

## V.   Conclusion

Having considered the Parties' arguments, the testimony of all of the witnesses, and exhibits, the Court hereby finds that Plaintiffs were not exempt from the FLSA during the relevant time periods for the various reasons set forth above. Accordingly, Defendants EVO, Neill, and Copeman are liable for overtime pay for the four respective recoverable time periods for each Plaintiff. Moreover, since the Court finds that Defendants did not willfully violate the FLSA and in fact acted in good faith in their efforts to comply with the FLSA, the case is controlled by a two-year statute of limitations and no liquidated damages are awarded.

The Court notes that this order only resolves the issue of liability. It will issue a separate order regarding how it wants to proceed with regard to the determination of damages, attorney's fees, and costs.

IT IS SO ORDERED.

Signed at Houston, Texas, this 28th day of August, 2019.

ANDREW S. HANEN
UNITED STATES DISTRICT COURT