IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEROD HOBBS, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:16-CV-00770 |
| | § | |
| EVO INCORPORATED, *et al.*, | § | |
| Defendants. | § | |

## ORDER

Plaintiffs Jerod Hobbs, Ronald Lee, Jordan Arroyo, and Arlen Jones (hereinafter referred to individually by their respective surnames or jointly as "Plaintiffs") sued EVO Incorporated ("EVO") and certain individual corporate officers, Maurice McBride ("McBride"), Samuel Copeman ("Copeman"), and Francis Neill ("Neill"), for violations of the Fair Labor Standards Act ("FLSA"), claiming that they worked hundreds of hours of overtime for which they were not compensated as per the dictates of the Act. Defendants denied these allegations and claimed that these employees were exempt from the FLSA requirements. After a trial on the merits, the Court found that McBride was not liable as an employer, but that the FLSA did apply to the Plaintiffs, that they were not exempt, and that EVO, Neill, and Copeman were liable as employers (as that term is defined by the FLSA) for the unpaid overtime. (Doc. No. 114).[1]

### I. Introduction

The order did not fix damages, but merely decided the liability issues. Nevertheless, this Court noted that the evidence regarding the actual amount of unpaid overtime, as adduced by both parties, was not overwhelming and was in places flat out wrong (as admitted by all parties). It did

---

[1] With the exception of the instances where the Court notes a factual dispute, all facts set out herein constitute factual findings.

find that the time records were not an accurate reflection of the actual work performed and that the other damages evidence (which was in part, but not entirely, based upon those records) was far from precise. (Doc. No. 115). Hoping for some clarity, this Court issued an order for supplemental briefing on the issue of damages. (Doc. No. 116). In that order, the Court stated that it wanted the parties to propose specific findings based upon the evidence presented at trial. The Court emphasized the need for specificity twice in that *one*-page order.

In response, neither party provided this Court with specific calculations or figures based upon the actual evidence or otherwise. The Defendants, as is their privilege, maintained that, despite the Court's prior order, they were not liable. Nevertheless, instead of providing this Court with hypothetical numbers relating to the amounts due to each plaintiff assuming *arguendo* liability, they once again argued that all four plaintiffs should be awarded no damages. The Plaintiffs' briefing was not much better. While admitting various errors in the evidence presented at trial and in their proposed damages compilations (Exs. 34, 49, 69 & 92), their briefing, as is their privilege, merely argued that the overtime encompassed by those mistakes be deducted and that the Court's ultimate ruling should be based upon those exhibits and the relevant testimony.

In summary, neither side presented this Court with any specific and accurate proposed findings of fact based upon a straightforward interpretation of the actual evidence adduced at trial or even on a corrected basis. On the one hand, the Plaintiffs generally proposed the same figures that they presented at trial, leaving the Court to resolve the admitted "mistakes." On the other hand, the Defendants, despite the order requesting specifics, maintained the same position they had at trial—that none of the four plaintiffs should recover any damages at all. Consequently, this Court finds that both the Plaintiffs and the Defendants have waived any right to complain about the Court's damage calculation with the following exceptions. Plaintiffs have preserved their right to

argue that the four individuals should receive the amounts calculated in Exhibits 36 (Jones), 49 (Arroyo), 69 (Lee), and 92 (Hobbs). Defendants have waived their right to complain that the damages should be a specific amount for any plaintiff except they have preserved their right to argue that the amount for each plaintiff should be zero.

## II. Whether Plaintiffs Have Put Forward Sufficient Evidence of Damages

The genesis for the overall problem facing the Court is the manner in which the employees of EVO were instructed to keep their time. As a general proposition, the supervisors for the plaintiffs—perhaps because EVO thought these employees were FLSA exempt—did not require or even ask their employees to keep time records that were accurate reflections of the time actually worked. Although the expectations and instructions changed over the time periods at issue here and also varied depending on the supervisor in charge. Certainly in the beginning some of the Plaintiffs were told to record eight hours per day if the employee worked in the shop and twelve hours per day if on the road or at the rig site, regardless of the actual time spent on task. They could have worked more time or less time. As mentioned, these time keeping instructions varied depending on the year and the supervisor, but this formula covered a considerable portion of the time periods at issue.

Legally, this presents an issue for the Court. Who bears the burden of this imprecision— the Plaintiffs who were just doing as instructed by their supervisors or the Defendants who, not surprisingly, claim the Plaintiffs have the burden of proof and their reliance on inaccurate records negates any probative value? Much of Defendants' briefing argues that Plaintiffs have not met their burden of proving specific instances of overtime work based upon these problems. Plaintiffs, in reply, argue that they have given the court a sufficient basis to support their damages claim.

3

"[A]n employee who brings suit for unpaid overtime compensation bears the burden of proving, with definite and certain evidence, that he performed work for which he was not properly compensated." *Reeves v. International Telephone & Telegraph Co.*, 616 F.2d 1342, 1351 (5th Cir. 1980), *implicit overruling on other grounds recognized in Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 n.4 (5th Cir. 1999). This burden is somewhat alleviated where "an employer keeps incomplete or inaccurate records." *In re Williams*, 298 F.3d 458, 463 (5th Cir. 2002) (internal quotations omitted). In those situations, an employee "carrie[s] out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* "Once the employee carries his burden, the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.*

Here, both sides acknowledge that the time records entered by Plainttiffs kept by Defendants are not accurate portrayals of the hours actually worked by Plaintiffs. Defendants blame the Plaintiffs for this problem. Plaintiffs maintain, and the evidence supports their position, that they merely recorded their time as instructed by their supervisors. Defendants in all likelihood did not worry at the time about accurate time records because they mistakenly thought the Plaintiffs were exempt from the FLSA. While this mistake was not committed intentionally or maliciously, it is still a mistake that EVO made, and Defendants must bear the consequences. As such, Defendants' failure to comply with the FLSA's recordkeeping requirement does not provide them with a Get Out of FLSA Free card. Plaintiffs have met their burden of proving that they performed overtime work for which they were not compensated as required by the FLSA and produced sufficient and reasonable evidence to show the amount and extent of that work. Both the testimony

at trial and the Defendants' (admittedly flawed) business records provide an adequate baseline for the Court to make a just and reasonable inference as to the amount of hours Plaintiff's worked in excess of the standard forty-hour workweek. Defendants have provided some evidence suggesting errors in Plaintiffs' calculations, and the Court has taken those errors as well as others it has identified into consideration in reaching these findings and conclusions.

### III. Additional Matters

Prior to discussing the actual damages in dispute, there are three situations that are out of the ordinary that need to be mentioned. The first concerns Plaintiff Arlen Jones. Jones was the most experienced hand at the time he started work with EVO. He was given the same instructions as the other Plaintiffs with regard to time keeping. Importantly for this case, at some point in time Jones decided to ignore the instructions and he started keeping a record of the actual time he spent working. Consequently, his time records can be considered (to the extent such a distinction is meaningful) to be more accurate than the other individuals.

The second point that this Court finds applies to all four Plaintiffs. Each Plaintiff testified that they were not told (and had not agreed) that their salary was fixed regardless of the hours. This testimony is clearly not credible. It is undercut by the written agreements, their own descriptions of how they were paid and the entirety of the remaining evidence. They also stated or at least implied that their bonuses depended on the amount of hours they worked. While one could conclude that this could at least in one aspect be literally true—if they did not work, they did not get a bonus—this is also not supported by the evidence. The evidence is overwhelming that their bonuses depended upon the ticket (invoice to customer)—not on the amount of hours they expended on the job.

The third situation involves Plaintiff Jordan Arroyo. Arroyo was the least experienced and least mature of the individual plaintiffs—not only in terms of age but also in terms of ability and work history. There is some evidence late in his EVO tenure in which Arroyo appears to be a leadman and perhaps the only "field engineer" at a jobsite for EVO. While this Court recognizes the existence of some conflicting evidence, it finds based upon the great weight and preponderance of the evidence that Arroyo was a trainee who never progressed as expected and who, at best, acted only upon the express direction and control of his supervisor.[2] His supervisor, Gregg Linville, was an unusual EVO supervisor as he was not actually an EVO employee. Linville can be more accurately described as a consultant or an independent contractor. Despite the fact that Linville was not an employee, perhaps in an attempt to build or maintain a foothold in California, EVO hired Arroyo to basically be Gregg Linville's assistant. Linville was a large individual whose physical abilities were somewhat limited, and Arroyo assisted him in coping with his limited mobility.

The evidence also revealed, perhaps to the surprise of some at EVO, that a considerable amount of time that Arroyo worked at the EVO shop was actually spent working on a wireline truck, which was a personal outside project for Linville. EVO objects to the inclusion of any time Arroyo spent working on this venture (although EVO does not actually suggest a specific amount of time) and argues that it should not be counted against EVO in this case. The Court overrules this objection. Arroyo was hired by EVO supervisor, Troy Sutherlin. Sutherlin hired him to work for and to be under the director of Linville. He was to act at Linville's sole direction. Consequently, while Sutherlin was above Arroyo as far as the intra-EVO chain of command might be viewed,

---

[2] The Court recognizes that its previous order was not a pinnacle of clarity on this point in that it stated Arroyo was a trainee from March 24, 2014 to July 26, 2015, while also stating he was a trainee for the last six months of his tenure with EVO which ended on January 26, 2016. To clarify any perceived inconsistency, the Court here formally finds that Arroyo was a trainee at all times relevant to this suit.

Arroyo was directed to do the bidding of Linville, and that is what he did. One cannot penalize an individual in an FLSA setting for following the directions of the supervisor who hired him and his actual onsite boss. Moreover, EVO's video services are run in conjunction with wireline units and it was not unreasonable for Arroyo to think (as he testified to) that a completed wireline truck, regardless of whom owned it, could ultimately benefit EVO. EVO's objections in this regard are therefore overruled. The Court finds Arroyo was essentially a trainee for the extent of his duration at EVO and that he at all pertinent times was performing services as directed by EVO.

### IV. The Plaintiffs

EVO's business was to provide down hole video services to those in the process of drilling or reworking oil wells. Jerod Hobbs initially went to work for EVO in West Virginia in 2011 as a "base manager." He moved to Oklahoma in 2013 and remained employed by EVO as a field engineer. He worked pursuant to an employment agreement that paid him $72,000 per year in 2014 and $84,000 per year in 2015, 2016, 2017, and 2018. He also received bonuses, but these were not based upon the time he worked. They were based upon the ticket (job invoice) amount. His initial supervisor was Troy Sutherlin. Hobbs left EVO on August 6, 2018.

Typically, Hobbs would get a call to spring into action from Troy Sutherlin or, after Sutherlin left, Arthur White. They would have been the individuals who would have actually spoken to the client. Hobbs was on 24-hour call. He would get a job description, load the appropriate equipment on the truck, and then head to the drill site. EVO's services were usually called for when there was trouble on the well-site so time was of the essence. This call could come at any time. Hobbs travelled all over the United States to perform work for EVO including Texas, Oklahoma, New York, Ohio, Alaska, Louisiana, Mississippi, Arkansas, and Kansas. In the continental United States this entailed driving—sometimes long distances to the well-site.

With regard to keeping time, Hobbs was told by Sutherlin to record 8 hours time per day when he was in the shop and 12 hours when he was on the road or at a job-site, regardless of whether he worked more or less time. In early 2016, Arthur White took over for Sutherlin. He required a more specific description as to the actual tasks involved and told Hobbs to account for all of the time he was away from home for EVO business—which would include such things as travel and stand-by time.

Ron Lee was a retired military veteran having spent time in the Air Force as a missile facility specialist. He went to work for EVO in September of 2014. He spent the first six months as a trainee before he began operating under the title of field engineer. Arthur White was his supervisor. He left EVO on May 4, 2018. Like Hobbs, Lee was on 24-hour call and his supervisor (in this case White) would get the call from the client. He would then call Lee (day or night) to load up and get to the job site. Lee was based in Colorado, but did a lot of work in Texas, Oklahoma, and North Dakota, too.

Lee's original salary was $54,000 a year, until March of 2016 when it was lowered to $43,200—a 20% reduction due to a downturn in the industry. It was subsequently restored. He earned $35,316.70 in 2014, $97,902.40 in 2015, $68,448.90 in 2016, $73,623.08 in 2017, and $13,807.69 in 2018. Included in these amounts are the job bonuses he also received. These bonuses depended on the ticket amount, not the hours worked.

When he started as a trainee he was instructed by White to keep time by just putting down what the other engineers did. Some time later he was instructed to make the hours reflect what was being billed to the customer as opposed to what was actually being worked. At some point the time keeping format changed and it became more descriptive to include items such as stand-by, travel, shop, and job-site time.

Arlen Jones started as a field engineer with EVO in 2011 and left in October of 2014. As explained above, he had the most oilfield experience of all the Plaintiffs when EVO hired him. He worked out of the Oklahoma location, but traveled to a variety of locales to actually perform EVO's services. Like Hobbs and Lee, he was on 24-hour call and would have to spring into action if a supervisor called to send him to a client's rig to get a video. He earned $12,293 in 2014. His base salary was $6,500 per month plus bonuses that were based upon the job ticket. He was told to keep his time the same way Hobbs was: 12 hours per day on the job-site, 8 hours per day if in the shop. Nevertheless, due to the amount of time he was traveling on the job, Jones started to keep his actual time.

Jordan Arroyo started as a field engineer trainee. His prior oilfield experience had been as an entry level maintenance worker. He worked solely in California. As mentioned above, this Court finds despite some evidence to the contrary that he never actually progressed much beyond the trainee point. He performed 90% of all the jobs with Linville, his supervisor, present and running the show. At some point he started receiving bonuses. He received a ½ bonus for the jobs he performed with Linville and a full bonus if he acted on his own. Again, the actual amount was dependent on the ticket, not the time worked.

He started on January 1, 2013 and worked until he was laid off on January 26, 2016. Arroyo's starting salary was $4,000 per month. He made $58,752 in 2014, $60,530.88 in 2015, and $9,855 in 2016. Arroyo's description of the instructions he received regarding time keeping boiled down to his one-word description: "murky." When he started he put the "12 and 8" formula apparently like the some of other plaintiffs, but he admitted he was always confused as to what the appropriate procedure was.

## V. Whether the Fixed Weekly Wage Method is Appropriate

The parties also contest which multiplier is appropriate for Plaintiffs' damages. Defendants argue that Plaintiffs are only permitted to recover half-time (0.5), whereas Plaintiffs contend that they are entitled to the more common remedy of time-and-a-half (1.5). In support of their argument, Defendant's cite to the Fifth Circuit's decision in *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1138–39 (5th Cir. 1988), where the court held that "when the employer and employee have agreed on a fixed salary for varying hours[,] . . . [t]he correct method [of retroactively computing a misclassified employee's overtime premiums] for that week is . . . determined by multiplying all hours over 40 in the workweek by 1/2 the regular rate for that workweek." *See id.* (citing 29 C.F.R. § 778.114(a) & 29 C.F.R. § 778.109). Plaintiffs dispute the fact that they agreed to work a fixed weekly wage ("FWW") for varying hours and instead argue that they are entitled to the FLSA's standard time-and-a-half multiplier, *see* 29 U.S.C. § 207, but as noted above the greater weight of the evidence supports the opposite conclusion.

"The FWW method of calculating overtime premiums in a misclassification case is appropriate when the employer and the employee have agreed that the employee will be paid a fixed weekly wage to work fluctuating hours." *Black v. SettlePou, P.C.*, 732 F.3d 492, 498 (5th Cir. 2013). The Fifth Circuit has recognized four pre-requisites to applying the FWW method:

> (1) the employee's hours must fluctuate from week to week; (2) [the employee] must receive a fixed salary, regardless of the number of hours worked that week; (3) the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate; [and] (4) the employee clearly understands that the covers whatever hours the job may demand in a particular work week.

*Conne v. Speedee Cash of Miss., Inc.*, 246 F. App'x 849, 851 (5th Cir. 2007). The parties do not contest the first three prerequisites. Their disagreement focuses on the final requirement—whether the employer and employee had a clear and shared understanding of the compensation structure.

10

"The question of whether an employer and employee agreed to a fixed weekly wage for fluctuating hours is a question of fact." *Id.* In determining whether such an agreement existed, "[t]he parties' initial understanding of the employment arrangement as well as the parties' conduct during the period of employment must both be taken into account." *Id.*

While the Plaintiffs contest the application of the FWW method, their position is contrary to the great preponderance of the evidence. It is clear to the Court, and the Court hereby finds, that each Plaintiff agreed that their salary was pegged at a level that was fixed and that it was meant to cover all hours worked per week—regardless of the number of hours actually worked that week. Further, the evidence establishes that their hours fluctuated week to week. The salaries all four individuals were paid were fixed, regardless of how many hours they worked. Finally, both sides concede and the Court hereby finds that the salary was large enough to prevent a drop below the minimum hourly rate. This Court finds these facts by a preponderance of the evidence and concludes as a matter of law that the FWW method is appropriate to apply here.

VI.  **Final Damages Calculations**

As mentioned before, to compute a misclassified employee's overtime premiums under the FWW method a court "multipl[ies] all hours over 40 in the [given] workweek[s] by 1/2 the regular rate for that workweek." *Blackmon.*, 835 F.2d at 1138–39 (citations omitted). "The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 C.F.R. § 778.109. Here, the Court divided the total renumeration for each workweek (each plaintiff's base pay plus any field work bonus received in the given week) by the total number of hours actually worked by the plaintiffs in that workweek to receive the regular rate for that workweek. The Court then multiplied

all hours over 40 in the given workweeks by 1/2 the regular rate for that workweek. *See Blackmon.*, 835 F.2d at 1138–39. The damages awarded to each Plaintiff represents the sum of these calculations.

Based upon the findings of facts and conclusions of law set out above, the Court hereby finds based upon a preponderance of the evidence the following facts pertaining to damages:

### A. Arlen Jones

Jones was employed from March 24, 2014 to October 5, 2014 during the time periods not barred by the statute of limitations. His base weekly salary was $1,653.84. He earned bonuses ranging from $0 to $3,850 depending on the week. His overtime hours ranged from 0 to 67 hours depending on the week. The Court finds based upon the credible evidence in this case that he worked a total of 507 hours of overtime during the entire time in question. Based upon the preponderance of the evidence, the FLSA, the relevant regulations and the applicable Fifth Circuit case law, the Court finds that Jones is entitled to damages of $11,166.91 in unpaid overtime.

### B. Jordan Arroyo

During the relevant time period, Arroyo was employed from March 24, 2014 to July 5,2016. His base weekly salary was $923.08. He earned bonuses ranging from $0 to $1000 depending on the week. He only received bonuses in approximately 50% of the weeks he was employed. His overtime hours likewise ranged from weeks in which he had no overtime to weeks when he had as many as 32 hours of overtime. His overtime hours were much less per week than the other Plaintiffs; additionally the percentage of weeks he worked overtime was lower. The Court finds based upon the credible evidence in this case that he worked a total of 735 hours of overtime during the entire time in question. Based upon the preponderance of the evidence, the FLSA, the

relevant regulations and the applicable Fifth Circuit case law, the Court finds that Jones is entitled to damages of $7,618.59 in unpaid overtime.

**C. Ronald Lee**

Lee worked for EVO from September 1, 2014 to February 23, 2018 during the relevant time period. His base weekly salary was $1039.26 from when he started until February 28, 2016. From February 29, 2016 until August 15, 2016 his base salary was reduced by 20% such that his base salary dipped to $830.77. It was restored to the original pay figure in August of that same year. As with the other Plaintiffs, Lee had weeks where his bonuses ranged from zero a high of $2850 in a week. During the time period in question he had many weeks in which he did not work overtime and in some weeks the overtime ranged up to a high of 128 hours. The Court finds based upon the preponderance of the evidence in this case that he worked a total of 3248.8 hours of overtime during the time in question. Based upon the preponderance of the evidence, the FLSA, the relevant regulations and the applicable Fifth Circuit case law, the Court finds that Jones is entitled to damages of $41,451.48 in unpaid overtime.

**D. Jerod Hobbs**

Hobbs worked for EVO from March 24, 2014 through July 29, 2018 during the relevant time period. His initial base pay was $1,384.62 until January 4, 2015. His base pay then jumped to $1,615.38, where it remained until he left EVO. His bonuses ranged from $0 to a high of $4200 weekly. While he did not receive a bonus every week, Hobbs (like Lee and Jones) earned a bonus more weeks than not. According to Plaintiffs, his overtime hours ranged from 0 to 128 hours per week. These latter weeks drew strenuous but not specific objections from Defendants as a forty-hour workweek plus 128 hours of overtime constitute 24 hours of work per day for seven days. Hobbs testified that he recorded time for these 24-hour days because EVO instructed him to

account for all hours spent away from home on EVO business. As with all of the other objections, the Court has analyzed the evidence adduced at trial and, when supported by appropriate evidence, has made the appropriate adjustments. The Court finds based upon a preponderance of the evidence in this case that he worked a total of 7656 hours of overtime during the entire time in question. Based upon the preponderance of the evidence, the FLSA, the relevant regulations and the applicable Fifth Circuit case law, the Court finds that Jones is entitled to damages of $119,139.60 in unpaid overtime.

### VII. Conclusion

For the foregoing reasons, the Court finds Defendants are jointly and severally liable for $11,166.91 in damages to Plaintiff Arlen Jones, for $7,618.59 in damages to Plaintiff Jordan Arroyo, for $41,451.48 in damages to Plaintiff Ronald Lee, and for $119,139.60 in damages to Plaintiff Jerod Hobbs.

SIGNED at Houston, Texas this 28 day of January, 2020.

Andrew S. Hanen
United States District Judge